680 A.2d 649

THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
JACINTO K. HIGHTOWER, DEFENDANT-APPELLANT.

Argued November 6, 1995—Decided August 8, 1996.

242

*Robert L. Sloan* and *James K. Smith, Jr.,* Assistant Deputies Public Defender, argued the cause for appellant (*Susan L. Reisner,* Public Defender, attorney).

*Linda A. Rinaldi,* Deputy Attorney General, argued the cause for respondent (*Deborah T. Poritz,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

COLEMAN, J.

In *State v. Hightower,* 120 *N.J.* 378, 577 *A.*2d 99 (1990), this Court affirmed the 1986 capital murder conviction of defendant, Jacinto K. Hightower, but reversed his death sentence and remanded the matter for a new penalty-phase proceeding. At the second penalty trial, defendant was again sentenced to death. Defendant presently appeals that sentence pursuant to *Rule* 2:2–1(a)(3). Because of juror misconduct during jury deliberations that exposed the jury to extraneous influences, we reverse and remand for a new penalty trial.

## I

The facts and procedural history of this case are fully set forth in *Hightower*. *See Hightower I, supra,* 120 *N.J.* at 386–99, 577 *A.2d* 99. Thus, we limit our recitation to only the facts and history relevant to this appeal.

Shortly after 12 p.m. on July 7, 1985, during the course of a robbery in a Cumberland Farms convenience store, defendant shot the clerk, Cynthia Barlieb, in her chest after she refused to comply with his demands to open the cash register. After falling to the floor as a result of the gun shot wound, Barlieb stood up, cried out and again refused to comply with defendant's repeated demands to open the cash register. Defendant shot Barlieb again, this time in the neck. While Barlieb laid on the floor, she touched defendant's leg. Defendant then shot her in the head. At 12:40 p.m. a customer discovered Barlieb's body in the store's dairy freezer.

Defendant was indicted for purposeful murder by his own conduct, contrary to *N.J.S.A.* 2C:11–3a(1); knowing murder by his own conduct, contrary to *N.J.S.A.* 2C:11–3a(2); felony murder, contrary to *N.J.S.A.* 2C:11–3a(3); first-degree robbery, contrary to *N.J.S.A.* 2C:15–1; second-degree possession of a weapon for an unlawful purpose, contrary to *N.J.S.A.* 2C:39–4a; and third-degree unlawful possession of a handgun, contrary to *N.J.S.A.* 2C:39–5b.

In October 1986, the jury found defendant guilty on all counts of the indictment. During the penalty trial, the State asked the jury to consider three aggravating factors: (1) "[t]he murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated assault to the victim," *N.J.S.A.* 2C:11–3c(4)(c); (2) "[t]he murder was committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense committed by the defendant," *N.J.S.A.* 2C:11–3c(4)(f); and (3) "[t]he offense was committed while the defendant was engaged in the commission of,

or an attempt to commit, or flight after committing or attempting to commit ... robbery," *N.J.S.A.* 2C:11–3c(4)(g).

The defense, on the other hand, produced six expert witnesses, and submitted five mitigating factors to the jury: (1) "[t]he defendant was under the influence of extreme mental or emotional disturbance insufficient to constitute a defense to prosecution," *N.J.S.A.* 2C:11–3c(5)(a); (2) "[t]he age of the defendant at the time of the murder," *N.J.S.A.* 2C:11–3c(5)(c); (3) "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of mental disease or defect or intoxication, but not to a degree sufficient to constitute a defense to prosecution," *N.J.S.A.* 2C:11–3c(5)(d); (4) "[t]he defendant has no significant history of prior criminal activity," *N.J.S.A.* 2C:11–3c(5)(f); and (5) "[a]ny other factor which is relevant to the defendant's character or record or to the circumstances of the offense." *N.J.S.A.* 2C:11–3c(5)(h).

On November 10, 1986, defendant was sentenced to death after the jury found that the State had proven each of the aggravating factors beyond a reasonable doubt. Although the jury determined that defendant had established two mitigating factors, *N.J.S.A.* 2C:11–3c(5)(f) and (h), it found that each of the aggravating factors outweighed all of the mitigating factors beyond a reasonable doubt, and that all of the aggravating factors outweighed all of the mitigating factors beyond a reasonable doubt.

On appeal, this Court reversed the death sentence because the Attorney General conceded that the trial court erroneously charged the jury to consider only those mitigating factors found to have been unanimously established. *State v. Hightower, supra,* 120 *N.J.* at 386, 577 *A.*2d 99.

## II

Jury selection for the new penalty trial was conducted between September 12 and October 24, 1994. Thereafter, a seven-day trial ensued. The State relied on two aggravating factors: murder to

avoid apprehension, *N.J.S.A.* 2C:11–3c(4)(f); and murder during a robbery, *N.J.S.A.* 2C:11–3c(4)(g). Defendant relied on fourteen mitigating factors: (1) defendant's age at the time of the murder, *N.J.S.A.* 2C:11–3c(5)(c); (2) defendant had no prior record of criminal convictions, *N.J.S.A.* 2C:11–3c(5)(f); (3) defendant was never adjudicated a juvenile delinquent, *N.J.S.A.* 2C:11–3c(5)(h); (4) defendant was sodomized as a young child, *ibid.;* (5) defendant's mother was diagnosed as suffering from a severe emotional disorder during his childhood, *ibid.;* (6) defendant during his formative years frequently assumed responsibility for the care of his younger twin siblings, *ibid.;* (7) defendant was placed in foster care during his formative years, *ibid.;* (8) during his formative years, defendant's mother deserted the family for periods of time, on one occasion during the holiday season, *ibid.;* (9) defendant was raised in an abusive and dysfunctional environment, *ibid.;* (10) the imposition of the death penalty would entail excessive hardship on members of defendant's family, *ibid.;* (11) defendant was engaged in productive employment while in state prison, *ibid.;* (12) defendant did not know the identity of his natural father, *ibid.;* (13) defendant witnessed the abuse of his siblings during his formative years, *ibid.;* and (14) any other mitigating factor that the jury found to exist. *Ibid.*

The only testimony presented by the State was that of Christopher Forston who had also testified at the guilt trial. Forston testified about a conversation that he had with defendant after the Cumberland Farms murder in which defendant voluntarily told Forston how he had committed the crime. Forston testified that defendant told him "he had killed a woman in a store because she wouldn't cooperate with him." According to Forston, defendant had recounted the crime as follows. Defendant entered the Cumberland Farms carrying a tote bag and waited for the customers to leave. He then picked up a box of Pampers, set it on the counter, walked to the door, turned the "open" sign to "closed," returned to the counter and asked the clerk for a pack of cigarettes. As the clerk turned her back and reached for the cigarettes, defendant pulled a gun out of his tote bag and demand-

ed the clerk to open the cash register. Forston further testified that defendant stated that "the 'old bitch' would not cooperate [so he] shot her one time in the chest."

Additionally, Forston testified that defendant told him that after the first shot, the clerk fell to the floor but got back up hollering and refused defendant's second request to open the register. Defendant then shot her in the neck. The woman fell to the floor again. Defendant jumped over the counter and began to bang on the cash register because he did not know how to open it. When he felt the clerk grab his leg, he shot her in the head and left the store.

At the conclusion of Forston's testimony, defense counsel moved to dismiss the aggravating factor, murder to avoid apprehension, *N.J.S.A.* 2C:11–3c(4)(f). The defense argued that the State had not produced evidence, either direct or circumstantial, from which the jury could rationally conclude beyond a reasonable doubt that defendant killed Barlieb to avoid apprehension. Rather, the defense insisted that Forston's testimony was direct evidence that defendant killed Barlieb solely because she refused to cooperate. The trial court denied the motion, reasoning that a factual issue was presented and required a determination by the jury. The case was submitted to the jury with a special verdict sheet.

The jury commenced its deliberations on October 31, 1994, at 3:15 p.m. After deliberating for approximately one hour, the jury recessed for the day. The trial court collected from the foreperson the verdict sheet on which the jury had made some notations, as well as other notes, and sealed them in an envelope. The following morning, the jury reconvened at 9:15 a.m. to continue its deliberations. After approximately six and one-half hours of deliberating, over a two-day period, the jury submitted the following note to the court:

[I]t has come to our attention that one of the jurors has information and knowledge about this case beyond the scope of the evidence given in Court. We ask your direction in regard to this matter.

The court responded by instructing the jurors to temporarily suspend deliberations and not to discuss the case or the subject of the note. The trial court then interviewed each juror individually in chambers and in the presence of counsel. During those interviews, the judge asked each juror not to reveal his or her position to the court, or to any other juror, with respect to the point at which each juror was in the deliberations or any position taken.

Notwithstanding the judge's instructions, the jury foreperson disclosed during the interview that Juror Number 7 had informed the jury that he had heard, outside of the courtroom, that the victim had three children. Describing the context in which Juror Number 7 made the statement, the foreperson explained:

> There was a fairly intense debate going on at that point in time where [Juror Number 7] was taking a different position than some of the other people, and there was a fair amount of frustration from some other people about the position he was taking, and essentially he was ... getting backed into a corner ... and he was almost lashing out.

The foreperson's account of Juror Number 7's statement and the circumstances surrounding it were confirmed by several other jurors. Indeed, Juror Number 7 admitted in his interview making that statement about the victim having children. He stated that he had overheard that statement while he was shopping in a store earlier in the week. He pointed out, however, that he did not partake in the discussion.

At the conclusion of the interviews, despite the trial court's efforts to avoid learning the jurors' positions on the merits of the case, the position of Juror Number 7 had been disclosed by both Juror Number 7, and the foreperson. For example, at one point during the his interview, the foreperson stated that Juror Number 7 "was taking a different position than others in the room." Additionally, in responding to a question from the trial court, Juror Number 7 explained:

> I told them I thought that he should get 30 years imprisonment instead of the death sentence because it seems by his time in prison he could be a productive citizen when he come out. Now, majority of them jumped me for that.... Well, they said, you must have heard something we didn't hear, and I says, all I

overheard—I didn't discuss this with no one—was that the lady had three children....

Interviews with other jurors also revealed that Juror Number 7 may have engaged in other misconduct, namely, dishonesty in responding to questionnaires completed during the jury selection process. The specific act of dishonesty alleged was that the juror failed to disclose that he opposed the death penalty and that he had visited prisons in the past.

Finally, during the interviews several jurors told the trial court that at the time Juror Number 7 informed the jury that the victim had children, the jury had reached a rather advanced·stage of deliberations. One juror indicated that he had already made up his mind when he learned of the information; another revealed that the jury had already taken a straw vote; and the foreperson stated that the jury was at a "fairly late point" in its deliberations. In addition, the verdict sheet indicated that the jury had made tentative determinations with respect to the existence of both aggravating factors and all mitigating factors. The only section of the verdict sheet left unmarked was that reserved for the jury's ultimate conclusion with respect to the sentence.

Having all this information, the trial court then heard arguments from the State and defense counsel, outside the presence of the jury, regarding how to resolve the jury crisis. The State recommended that the court remove Juror Number 7 from the jury, insert an alternate, and instruct the jury to begin deliberations anew. Defense counsel, on the other hand, insisted that the appropriate remedy was a mistrial, or in the alternative, that deliberations should continue with Juror Number 7 on the jury because *Rule* 1:8–2(d) did not authorize removal for the type of misconduct involved.

Agreeing with the State, the trial court rejected defense counsel's request and ordered that Juror Number 7 be removed from the jury and replaced with an alternate. In denying the application for a mistrial, the court reasoned that it had no conclusive information concerning the positions of any of the jurors, except

Juror Number 7, on the merits of the case. The court further explained that six hours of deliberations in the penalty phase of a capital case was not a very long time. The court then declared that its main reason for removing Juror Number 7 from the jury was that the juror had revealed information learned outside of the courtroom to the jury instead of to the court as instructed. The trial court expressed concern that the juror had the potential to repeat the misconduct. The court further considered the necessity to protect the integrity of the process that had been threatened by the conduct of Juror Number 7.

After the judge's ruling, an alternate juror was selected and the entire jury was instructed to continue its deliberations. The judge cautioned the newly-constituted jury that it was to "totally disregard" the outside information revealed by removed-Juror Number 7, and begin its deliberations anew. The court provided the new jury with a blank verdict sheet, retaining the former verdict sheet and notes in a sealed envelope. The reconstituted jury recommenced deliberations on November 2, 1994, at 11:03 a.m. Four and one-half hours later, the jury returned a verdict of death.

A poll of the jury confirmed that it had unanimously concluded, beyond a reasonable doubt, that both aggravating factors existed, namely, murder to avoid apprehension, *N.J.S.A.* 2C:11–3c(4)(f), and murder committed during the commission of another crime, *N.J.S.A.* 2C:11–3c(4)(g). The poll further confirmed that the jury was unanimously satisfied that any and all of the aggravating factors outweighed the ten mitigating factors found to exist. The accepted mitigating factors were: (1) defendant's age at the time of the murder; (2) defendant had no prior record of criminal convictions; (3) defendant was never adjudicated a juvenile delinquent; (4) defendant was sodomized as a young child; (5) defendant's mother was diagnosed as suffering from a severe emotional disorder during his childhood; (6) during his formative years, defendant had frequently assumed responsibility for the care of his younger twin siblings; (7) during his formative years, defendant was placed in foster care; (8) during his formative years,

defendant's mother would desert the family for periods of time, on one occasion during the holiday season; (9) defendant was raised in an abusive and dysfunctional environment; and (10) the imposition of the death penalty would entail excessive hardship on members of defendant's family. Accordingly, defendant was sentenced to death.

After the verdict was received, defense counsel requested that the court question the foreperson to determine the stage that the jury had reached in its deliberations when the new juror was substituted. Defense counsel also requested that the court seal and preserve the original jury's verdict sheet and notes for use on appeal. The trial court denied the first, but granted the second motion. We unsealed the verdict sheet pursuant to an order dated June 7, 1995. The sheet revealed that the first jury had tentatively found both aggravating factors and had made tentative findings on all of the fourteen mitigating factors. The sheet did not indicate, however, whether the jury's vote was final, whether the aggravating factors outweighed the mitigating or whether the jury would impose the death penalty or life imprisonment.

### III

Preliminarily, we reject defendant's claim that the New Jersey Death Penalty Act (Act) violates the Eighth Amendment to the United States Constitution. In *State v. Biegenwald*, 126 *N.J.* 1, 594 *A.*2d 172 (1991), this Court upheld the constitutionality of the Act in the face of equivalent challenges. *Id.* at 16, 594 *A.*2d 172; *accord State v. Harris*, 141 *N.J.* 525, 574, 662 *A.*2d 333 (1995); *State v. Moore*, 122 *N.J.* 420, 486, 585 *A.*2d 864 (1991); *State v. Hunt*, 115 *N.J.* 330, 373, 558 *A.*2d 1259 (1989); *State v. Koedatich*, 112 *N.J.* 225, 249, 548 *A.*2d 939 (1988), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L. Ed.*2d 803 (1989); and *State v. Ramseur*, 106 *N.J.* 123, 185–90, 524 *A.*2d 188 (1987). In addition, the constitutionality of the aggravating factor, *N.J.S.A.* 2C:11–3c(4)(c), has been upheld. *State v. Ramseur, supra*, 106 *N.J.* at 188–89 n. 21, 524 *A.*2d 188.

IV

■ Defendant argues that *Rule* 1:8–2(d) did not permit the trial court to remove Juror Number 7. He contends that even if that juror's disclosure of the out-of-court information rendered him "unable to function," his inability to function was not due to him personally; rather it was due to his interaction with other jurors or at least a combination thereof.

*Rule* 1:8–2(d) governs the removal and substitution of deliberating jurors. The Act complements the court rule by providing that "[n]othing in [the] statute shall be construed to prevent the participation of an alternate juror in the sentencing proceeding if one of the jurors who rendered the guilty verdict becomes ill or is otherwise unable to proceed before or during the sentencing proceeding." *N.J.S.A.* 2C:11–3c(1). The court rule for removal provides in pertinent part:

> If the alternate jurors are not discharged and if at any time after submission of the case to the jury, a juror dies or is discharged by the court because of illness or other inability to continue, the court may direct the clerk to draw the name of an alternate juror to take the place of the juror who is deceased or discharged.
> [*R.* 1:8–2(d).]

■ Despite the rule's broad language, trial courts do not have unbridled discretion to reconstitute deliberating juries in the face of a jury crisis. On the contrary, the removal rule may be used only in limited circumstances. Clearly, frequent reconstitution of deliberating juries could destroy the integrity and the mutuality of deliberations, thereby depriving defendants of the right to a fair trial by an impartial jury. The "mutuality of deliberations" is at the core of jury deliberations. It entails the joint or collective exchange of ideas among individual jurors that remains intact until a final determination is reached. *State v. Corsaro*, 107 *N.J.* 339, 349, 526 *A.*2d 1046 (1987). Mutuality may be destroyed if juror substitution is not made in accordance with the limited scope of the rule for removal. *Ibid.; R.* 1:8–2(d). Therefore, any conduct that could upset the process of jury deliberations, even judicial conduct such as juror substitution, must be carefully scrutinized.

■ Because juror substitution poses a clear potential for prejudicing the integrity of the jury's deliberative process, it should be invoked only as a last resort to avoid the deplorable waste of time, effort, money, and judicial resources inherent in a mistrial. *State v. Lipsky,* 164 *N.J.Super.* 39, 43, 395 *A.2d* 555 (App.Div.1978).

> The rule permits substitution of an alternate when the deliberating juror dies, becomes ill "or is otherwise unable to continue." These are, of course, precisely the circumstances mandating substitution of a juror during the trial itself. Because they relate exclusively to the personal situation of the juror him [or her] self and not to his [or her] interaction with the other jurors or with the case itself, they are ordinarily not circumstances having the capacity to affect the substance or the course of the deliberations. Hence the continuation of the trial with a substituted alternate is in these circumstances no way violative of defendant's right to trial by a fair and impartial jury. In this respect the "unable to continue" standard is much narrower than the concept of good cause requiring the discharge of prospective jurors before trial commences. "Good cause" in that context includes potential juror bias which would irremediably taint the entire jury, particularly in its deliberative process. Removal of such a juror after trial has commenced and even more particularly after deliberations have commenced cannot ordinarily repair the harm already done or presumed to have been done. Juror bias discovered during deliberations is clearly, therefore, not a circumstance susceptible to the discharge and substitution technique of the rule. Declaration of a mistrial would be the only available alternative.
>
> [*State v. Trent,* 157 *N.J.Super.* 231, 239, 384 *A.2d* 888 (App.Div.1978), *rev'd on other grounds,* 79 *N.J.* 251, 398 *A.2d* 1271 (1979).]

■ Although the death and illness standards are clear and narrow, the "inability-to-continue" standard, at first glance, appears vague and rather broad. That standard, however, must be narrowly construed and sparingly applied. *State v. Valenzuela,* 136 *N.J.* 458, 468, 643 *A.2d* 582 (1994); *State v. Trent, supra,* 157 *N.J.Super.* at 240, 384 *A.2d* 888.

Some of the questions concerning the narrow scope of the inability-to-continue standard were clarified in *Valenzuela,* in which the Court stated that to remove under the standard

> the record [must] adequately establish[ ] that the juror suffers from an inability to function that is personal and unrelated to the juror's interaction with the other jury members. If a court suspects that the problems with the juror are due to interactions with other jurors, the court should instruct the jury to resume deliberations.
>
> [*State v. Valenzuela, supra,* 136 *N.J.* at 472–73, 643 *A.2d* 582.]

██ Thus, the inability-to-continue standard may not be invoked to remove a deliberating juror when the record merely reveals that the juror has a position that is different from that of other jurors. *Id.* at 468–69, 643 *A.*2d 582. Nor may the standard be employed to remove a deliberating juror where the record reveals that the juror's problems are related to both personal circumstances *and* factors arising from the juror's interactions with other jurors. *Id.* at 473, 643 *A.*2d 582. In other words, the reason must be exclusively personal.

██ Conversely, the standard may be invoked to remove a juror when the record reveals that the juror's emotional condition renders him or her unable to render a fair verdict. *E.g., State v. Miller,* 76 *N.J.* 392, 406–07, 388 *A.*2d 218 (1978) (holding that removal of juror was warranted when juror's nervous and emotional condition renders him or her unable to render fair verdict); *State v. Trent, supra,* 157 *N.J.Super.* at 240, 384 *A.*2d 888 (finding that removal of juror was warranted when juror suffered from severe emotional and physical distress that made it impossible for juror to continue).

Under the facts and circumstances presented in this case, we hold that the trial court improperly expanded the scope of *Rule* 1:8–2(d)'s inability-to-continue standard when it removed Juror Number 7 from the deliberating jury. Although the juror did not follow the trial court's instructions to report to the court any information he overheard outside of the courtroom, and violated his oath by informing other jurors that the victim had children, that misconduct does not fall within the scope of *Rule* 1:8–2(d)'s inability-to-continue standard. That standard requires exclusively personal circumstances to justify removal of a deliberating juror. Juror Number 7 did not satisfy that standard because his misconduct was related to the case and to his interactions with the other jurors. Although it is not inconceivable that there might be some circumstances in which juror misconduct during jury deliberations might permit substitution of the offending juror, under the facts of this case the only option available is the "[d]eclaration of a

mistrial." *State v. Trent, supra,* 157 *N.J.Super.* at 239, 384 *A.*2d 888. *See infra* pp. 264–67, 680 *A.*2d at 661–63.

We note that the Appellate Division recently revisited the issue of juror substitution under the inability-to-continue standard. In *State v. Holloway,* 288 *N.J.Super.* 390, 402–03, 672 *A.*2d 734 (App.Div.1996), there was no objection to juror substitution because of juror misconduct that occurred after extensive deliberations. The lack of objection and the court's finding that the misconduct did not taint the remaining jurors distinguish *Holloway,* however, from our analysis in the present case. *See id.* at 404–05, 672 *A.*2d 734. In *State v. Singleton,* 290 *N.J.Super.* 336, 675 *A.*2d 1143 (App.Div.1996), a deliberating juror was excused under the inability-to-continue standard because the juror's religious views, among other things, interfered with his ability to reach a verdict. *Id.* at 345–46, 675 *A.*2d 1143. The Appellate Division found that the juror was improperly removed because of her interactions with other jurors. *Id.* at 349–50, 675 *A.*2d 1143. *Singleton* is consistent with *Valenzuela.*

## V

Defendant claims that because an alternate juror was improperly substituted for Juror Number 7, he was deprived of a non-unanimous verdict notwithstanding that juror's misconduct.

A non-unanimous verdict in the penalty phase of a capital case is a final verdict of life imprisonment without any further exposure to a death sentence. *N.J.S.A.* 2C:11–3c(3)(c); *State v. DiFrisco,* 137 *N.J.* 434, 483–84, 645 *A.*2d 734 (1994), *cert. denied,* —— *U.S.* ——, 116 *S.Ct.* 949, 133 *L. Ed.*2d 873 (1996); *State v. Hunt, supra,* 115 *N.J.* at 378, 380, 558 *A.*2d 1259; *State v. Ramseur, supra,* 106 *N.J.* at 301, 524 *A.*2d 188.

The cases relied on by defendant to support his assertion that he was deprived of the opportunity of a non-unanimous verdict fall into two categories. One group is based on the assumption that the jury was deadlocked. The other group focuses on whether the

jury had advanced too far in its deliberations to permit substitution of a juror. Neither group, however, discusses the appropriateness of declaring a mistrial when a juror's substitution and juror misconduct prevent the original jury from deliberating until reaching a final verdict.

-A-

There are three so-called jury-deadlock cases. In *DiFrisco*, after the jury had deliberated in a penalty trial for approximately four hours, it sent a note to the court advising that it had reached a verdict. *State v. DiFrisco, supra,* 137 *N.J.* at 481, 645 *A.*2d 734. As the court was about to receive the verdict, the trial court asked the foreperson whether the verdicts were unanimous. *Ibid.* When the foreperson answered no, and another juror indicated that the jury had not unanimously found the existence of an aggravating factor, the jury requested that it return to the jury room. *Id.* at 481–82, 645 *A.*2d 734. The court ordered the jury to resume its deliberations. *Id.* at 482, 645 *A.*2d 734. After further deliberations, the jury imposed the death penalty. *Id.* at 483, 645 *A.*2d 734.

This Court rejected an argument that defendant was deprived of a non-unanimous verdict. The Court concluded that despite the jury's note and its report to the trial court that its verdict was not unanimous, requiring the jury to deliberate further was proper because the jury was not deadlocked. *Id.* at 485, 645 *A.*2d 734.

In *Hunt*, the jury sent a note to the trial court stating that it could not reach a unanimous decision on whether a mitigating factor outweighed an aggravating factor. *State v. Hunt, supra,* 115 *N.J.* at 378, 558 *A.*2d 1259. This Court held that because the trial court failed to inquire of the jury whether its note "stated its verdict or whether the jury wanted more time to deliberate" before requiring further deliberations, and because the jury was not reminded that a non-unanimous verdict was acceptable, defendant was deprived of a realistic possibility that the death sentence would not have been imposed. *Id.* at 378–79, 558 *A.*2d 1259. This

Court therefore barred imposition of the death penalty. *Id.* at 379, 558 *A.*2d 1259.

In *Ramseur,* after the jury had deliberated in the penalty phase for four and one-third hours, the court received a note from the jurors stating, " 'Jury unable to reach a unanimous decision. Suggestions please.' " *State v. Ramseur, supra,* 106 *N.J.* at 301, 524 *A.*2d 188. Over defense counsel's objection, the court gave an "Allen charge," as modified by *State v. Czachor,* 82 *N.J.* 392, 401–02, 413 *A.*2d 593 (1980) (reminding jurors of their duty to consult with one another in reaching a unanimous verdict and urging dissenting jurors not to compromise for the purpose of achieving unanimity), and required further deliberations. After being instructed to attempt to reach unanimity two additional times, the jury imposed the death sentence. *State v. Ramseur, supra,* 106 *N.J.* at 302, 524 *A.*2d 188. This Court held that the trial court did not abuse its discretion in failing to declare that the jury was deadlocked when the note was submitted to the court. *Id.* at 302–04, 524 *A.*2d 188. Nevertheless, the supplemental charges were found to be coercive because the trial court did not reinform the jury of the consequences of a non-unanimous verdict. *Id.* at 305, 524 *A.*2d 188.

Accordingly, under *Ramseur,* if a jury reports to the court that it is unable to reach a unanimous verdict after about four hours of deliberations, the court is not obligated to declare the jury deadlocked. A trial court is permitted to require a jury to deliberate for a reasonable length of time before declaring a deadlock. *Id.* at 302–03, 524 *A.*2d 188; *State v. Czachor, supra,* 82 *N.J.* at 407, 413 *A.*2d 593. What constitutes a reasonable amount of time is influenced by the length of the trial and the complexity of the penalty issues. *State v. Ramseur, supra,* 106 *N.J.* at 303, 524 *A.*2d 188.

The penalty trial in the present case involved the difficult determination of whether the killing during the course of a robbery was to avoid detection or apprehension, *N.J.S.A.* 2C:11–3c(4)(f), as well as the existence of the 3c(4)(g) murder-during-a-

robbery aggravating factor and five mitigating factors. "In addition, the jury had to assess the defendant's mental state and decide whether mitigating factors outweighed aggravating factors." *State v. Ramseur, supra*, 106 *N.J.* at 303, 524 *A.*2d 188.

When the juror misconduct occurred in the present case, the jury had deliberated no more than six and one-half hours. Although Juror Number 7 apparently wished to impose a life sentence, there is no reasonable basis to assume that the power of persuasive argument would not have ultimately resulted in an uncoerced unanimous verdict for the death sentence. In *DiFrisco, Hunt,* and *Ramseur,* the question of whether the jury was deadlocked was precipitated by a note from the jury or a comment by the foreperson to the trial court. In the present case, however, there was no communication from the jury to the court that remotely suggested deadlock. Rather, it was the unsolicited remarks of jurors concerning the misconduct of Juror Number 7 that ignited the issue. Prior to that misconduct, the jury was continuing its deliberations without any suggestion that it had reached a genuine stalemate. Neither a genuine stalemate nor a jury's verdict is final until announced in open court. Further, when a verdict is reached, it is not final until confirmed by a polling of the jury unless waived. *State v. Shomo,* 129 *N.J.* 248, 259, 609 *A.*2d 394 (1992); 4 Charles E. Torcia, *Wharton's Criminal Procedure* § 578 (12th ed. 1976).

A defendant is entitled to a non-unanimous verdict only when the jury is deadlocked after deliberating a reasonable time. Although in the present case the jurors had taken a straw vote and voted on the aggravating and mitigating factors before learning that the victim had children, there is nothing in the record to suggest that the jury would have been unable to reach a unanimous verdict concerning defendant's sentence. Indeed, the record establishes that the jury was in the midst of deliberations when Juror Number 7 engaged in misconduct involving the other jurors. As one juror noted, an "intense debate" was ongoing when Juror Number 7 revealed the extraneous information. Additionally, the

verdict sheet that was removed from the sealed envelope confirms that no final vote had been taken and no verdict had been reached.

Furthermore, it is not uncommon for jurors to take several votes during the deliberative process, particularly an initial vote to determine each juror's position at the outset. *See State v. Levitt,* 36 *N.J.* 266, 269, 176 *A.*2d 465 (1961) (noting that jury took three votes before reaching its ultimate determination, with first vote taken one-half hour after jury began deliberating). Additionally, no litmus test can be devised for determining what is a reasonable time for deliberating. Lengthy deliberations are not uncommon during the penalty phase of a capital case. This Court has acknowledged that because the issues before the jury are so complex, deliberations of more than ten hours may be inadequate to reach a final conclusion on the appropriate sentence. *State v. Ramseur, supra,* 106 *N.J.* at 303, 524 *A.*2d 188.

We conclude, as did the Court in *DiFrisco* and *Ramseur,* that defendant was not deprived of a non-unanimous verdict because the jury had not reached a final verdict and was not deadlocked before the juror misconduct occurred.

-B-

Very few cases have addressed the issue whether a jury has deliberated too far to permit replacement of a deliberating juror with an alternate juror.

Since the 1972 amendment to *Rule* 1:8–2(d), juror substitution during deliberations has been permitted to prevent the necessity of a mistrial, particularly in protracted trials, because of the death, illness or other inability of a juror to continue deliberations until a verdict is reached. *Sub–Committee on Criminal Jury Deliberations of the Supreme Court Committee,* 95 *N.J.L.J.* 341, 355 (1972).

*Rule* 1:8–2(d) provides that when good cause is shown, an alternate juror may be substituted for a regular juror after deliberations have begun. Although the rule does not offend our

state constitutional guaranty of trial by jury, *State v. Miller,* 76 *N.J.* 392, 406, 388 *A.*2d 218 (1978), it should be used sparingly, only within the strict letter of the rule, and as a last resort to avoid the waste of time that would otherwise ensue. *State v. Valenzuela, supra,* 136 *N.J.* at 468, 643 *A.*2d 582; *State v. Trent, supra,* 157 *N.J.Super.* at 240, 384 *A.*2d 888.

In *Valenzuela,* within two hours after the jury commenced its deliberations, the court dismissed a juror because the juror was unable to deliberate in a coherent manner, and substituted an alternate. *State v. Valenzuela, supra,* 136 *N.J.* at 466, 643 *A.*2d 582. The reconstituted jury was instructed to "begin ... work anew." *Ibid.* Although the Court held that the juror substitution was improper because it was based on the excused juror's interactions with other jurors, *id.* at 472, 643 *A.*2d 582, it declined to discuss whether the jury deliberations had advanced too far to permit a substitution. *Id.* at 473, 643 *A.*2d 582.

In *State v. Moore,* 113 *N.J.* 239, 550 *A.*2d 117 (1988), the Court held that if an alternate is substituted at the beginning of the penalty phase of a death penalty trial, then guilt need not be deliberated anew. *Id.* at 306–07, 550 *A.*2d 117. The Court grounded its holding in the Legislature's intent to allow for bifurcated guilt and penalty trials where necessary. *Id.* at 306, 550 *A.*2d 117.

*Corsaro,* deals with whether a jury that has returned guilty verdicts against the defendants on some of the counts in an indictment may be reconstituted to consider other charges when one of the deliberating jurors returned to the courtroom intoxicated and more than one hour late. *State v. Corsaro, supra,* 107 *N.J.* at 341–42, 526 *A.*2d 1046. That juror was dismissed and replaced with an alternate; the newly constituted-jury was instructed "to begin your deliberations anew with respect to the open charges that you are considering." *Id.* at 344, 526 *A.*2d 1046. Guilty verdicts were returned on all the remaining charges. *Id.* at 345, 526 *A.*2d 1046. The defendants sought new trials on the grounds that a mistrial should have been granted when the intoxicated

juror was excused. *Ibid.* The trial court denied the motions and the Appellate Division affirmed. *Ibid.* This Court reversed, finding that substitution of a juror during the jury's deliberations after it had returned partial verdicts was improper because the deliberative process had advanced "to such a degree that it [was] strongly inferable that the jury [had] made actual fact-findings or reached determinations of guilt or innocence ... [and] the new juror [was] likely ... confronted with closed or closing minds." *Id.* at 352, 526 A.2d 1046. The appropriate remedy was to wait until the original juror was able to continue or declare a mistrial on the remaining charges. *Id.* at 354, 526 A.2d 1046.

In *State v. Trent,* 79 *N.J.* 251, 398 A.2d 1271 (1979), after the jury had deliberated approximately six and one-half hours, one of the jurors was replaced due to illness. *Id.* at 253, 398 A.2d 1271. The alternate juror was also replaced almost immediately. *Id.* at 254, 398 A.2d 1271. The jury was not instructed after either substitution to begin the deliberations anew. *Id.* at 253–54, 398 A.2d 1271. The Court reversed the conviction upon finding that the trial court had erred in failing to instruct the reconstituted juries to commence deliberations anew. *Id.* at 256–57, 398 A.2d 1271. *Trent,* however, did not address whether the jury's deliberations had advanced too far.

In *Miller,* after the jury had deliberated for approximately one and one-quarter hours, one of the jurors asked to be dismissed because he was too nervous and his nervousness affected his judgment. *State v. Miller, supra,* 76 *N.J.* at 401, 388 A.2d 218. Defendant's request for a mistrial was denied and one alternate juror was substituted. *Id.* at 401–02, 388 A.2d 218. Like *Trent,* the Court did not discuss whether the jury's deliberations had advanced too far.

■■■ From the few cases that have discussed whether the jury had deliberated too far to permit substitution pursuant to *Rule* 1:8–2(d), the conclusion to be drawn is that the only other viable option to juror substitution is a mistrial. Even if the remaining eleven jurors were not tainted by the misconduct of Juror Number

7, a jury of eleven was not permitted in this case. The parties may not stipulate that the jury may consist of fewer than twelve jurors in a capital case. *R.* 1:8–2(a). Because there can be no waiver of a properly constituted jury in a capital case, any verdict rendered by an improperly constituted jury would be a nullity.

## VI

Defendant argues further that although removal of Juror Number 7 was not an available option under *Rule* 1:8–2(d), the trial court should have granted his mistrial application because the jury was exposed to prejudicial out-of-court information about the victim having children.

This Court has consistently held that the essence of a fair trial requires the securing and preservation of an impartial jury, neither tainted by prejudice nor exposed to extraneous influences, even those judicial in nature. *State v. Bey I,* 112 *N.J.* 45, 75, 548 *A.*2d 846 (1988); *State v. Corsaro, supra,* 107 *N.J.* at 346–47, 526 *A.*2d 1046. The United States Supreme Court requires that a jury's verdict be based on evidence received in open court, not from outside sources. *Sheppard v. Maxwell,* 384 *U.S.* 333, 351, 86 *S.Ct.* 1507, 1516, 16 *L. Ed.*2d 600, 613 (1966). Trial courts have been required to protect jurors and their deliberations from outside influences that threaten to taint the verdict. *State v. Bey I, supra,* 112 *N.J.* at 75–76, 548 *A.*2d 846. The need to protect the integrity of the deliberative process in a capital case was summarized in *Bey I:*

We have explained that "the securing and preservation of an impartial jury goes to the very essence of a fair trial. . . . [This right] is of exceptional significance. . . . [T]riers of fact must be as nearly impartial 'as the lot of humanity will admit.'"

Of particular significance here is that aspect of impartiality mandating "that the jury's verdict be based on evidence received in open court, not from outside sources." As expressed by Justice Holmes, "[t]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." We recently noted the long-standing nature of this Court's commitment to the "[p]reservation of the jury's independence from extraneous—even judicial— influences." The Court has consistently required trial courts to protect both jurors

and their deliberations from illegitimate influences that threaten to taint the verdict.

[*Id.* at 75, 548 A.2d 846 (alterations in original) (citations omitted).]

When a jury is exposed to extraneous information after deliberations have begun, a mistrial will almost always be required. *State v. Kociolek*, 20 *N.J.* 92, 96–97, 118 *A.*2d 812 (1955). In *Kociolek*, a jury convicted the defendant of murder and sentenced him to death after it learned during deliberations, from some jury members, that defendant had been indicted on charges of assault and battery in an unrelated matter. *Id.* at 94, 118 *A.*2d 812. The trial court attempted to shield the jury from the information concerning the unrelated indictment by instructing the jury to render a verdict based only upon evidence presented inside the courtroom. *Id.* at 95–96, 118 *A.*2d 812. Reversing the trial court's decision to deny the defendant's motion for a new trial, Justice Brennan, writing for this Court, stated:

[T]he intrusion of the [unrelated indictments] into the jurors' deliberations, standing alone, introduced illegal and extraneous evidence fraught with peril for the defendant, an action the more grievous because taken in disregard, actually in defiance, of the explicit instructions of the trial judge. Since the law would have allowed a new trial if such extraneous prejudicial matter was erroneously admitted in evidence at the trial, it cannot tolerate the defeat of justice which would result from the indefensible exclusion of the juror's testimony as to the incident, where the matter came into the jurors' deliberations despite the commendable effort of court and counsel to prevent the mishap, and the jurors considered it, in violation of the court's instructions and of their oaths.

[*Id.* at 103–04, 118 A.2d 812.]

In this case defendant contends that even if the jury was properly reconstituted, a mistrial was nonetheless required because the jurors were exposed to prejudicial victim impact evidence, to wit, that the victim had three children. The revelation of that information, defendant insists, inevitably affected the eleven jurors who had been in favor of a death sentence before learning of the evidence, influenced them to adhere to their views and return a death sentence after learning of the evidence.

Allowing victim impact information to be placed before the jury without proper limiting instructions has the clear capacity

to taint the integrity of the jury's decision on whether to impose death. "The determination of a life or death sentence in a capital case is an extraordinarily delicate and sensitive judgment." *State v. Hightower, supra*, 120 *N.J.* at 439, 577 *A.*2d 99 (Handler, J., concurring in part and dissenting in part). The integrity of jury deliberations is a crucial aspect of a criminal prosecution. *State v. Corsaro, supra*, 107 *N.J.* at 346, 526 *A.*2d 1046. The deliberative process of a jury "must be insulated from influences that could warp or undermine the jury's ... ultimate determination." *Ibid.*

Juror misconduct that causes a substantial likelihood that one or more jurors were impermissibly influenced is enough to undermine the integrity of a death penalty trial without consideration of actual prejudice. That is so because each juror's vote is decisive, given that each juror must individually determine both the existence of mitigating factors and whether the aggravating factors outweigh the mitigating ones. *State v. Bey II*, 112 *N.J.* 123, 161, 548 *A.*2d 887 (1988) (citing *Mills v. Maryland*, 486 *U.S.* 367, 374–77, 108 *S.Ct.* 1860, 1865–66, 100 *L. Ed.*2d 384, 393–95 (1988).

The impact that improperly introduced victim impact evidence has on a jury is difficult to gauge. We observe that the trial court's questions were not framed to detect whether the jurors were influenced by the extraneous information. For example, the trial court asked one juror if he would be able to continue to decide the case "according to [his] best judgment." The court asked another juror "with [Juror Number 7] having said that, does that create any problem with you about going ahead and continuing to decide this case or continuing to get to wherever point you all can get?" If one or more of the jurors were already leaning in the direction of a death sentence and were further convinced by Juror Number 7's comment, then those jurors could have honestly answered the questions without ever indicating any effect that Juror Number 7's misconduct had on their judgment.

The potential for prejudice stemming from the kind of victim impact evidence Juror Number 7 introduced into the case was

obvious to both the trial court and counsel. The trial court took extreme precautions to shield the jury from exposure to information about the victim having children, recognizing that such information had a high probability to prejudice the jury against defendant. For example, all prospective jurors who had information from the media or elsewhere concerning the victim's children were excluded for cause during jury selection. The State, defense counsel, and witnesses were instructed to avoid making any reference to the victim's children during the trial. In addition, the victim's ten-year old niece was instructed to sit away from adult members of the victim's family in the courtroom.

Even if the victim impact information that was improperly placed before the jury could be properly introduced in evidence pursuant to the recently enacted statute, codified at *N.J.S.A.* 2C:22–3c(6) (see *State v. Muhammed,* 145 *N.J.* 23, 678 *A.*2d 164 (1996) discussing constitutionality of that statute), placing the victim impact information before the jury in this case cannot be regarded as harmless error. That statute and our Rules of Evidence contemplate that the trial court will give special instructions to the jury limiting its use of that evidence. *N.J.R.E.* 105. Here, the jury was never told how to use the information about the victim's children. Instead, it was told to disregard it, an instruction the jury could not conceivably carry out.

Thus, the jury's exposure to the victim impact evidence in the present case could have, in all likelihood, affected the result. Because the stakes are so high in a death penalty trial, where serious juror misconduct occurs, prejudice will be presumed. Accordingly, we hold that the introduction of victim impact information into the jury's deliberation in the present case had the clear capacity to prejudice defendant. We find that the trial court abused its discretion in denying defendant's application for a mistrial.

 The standard governing the grant of a new trial is the same for a mistrial. Any juror misconduct or improper intrusion into the deliberations of a jury that "could have a tendency to

influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge" is a ground for a mistrial. *Panko v. Flintkote Co.*, 7 *N.J.* 55, 61, 80 *A.*2d 302 (1951). A jury's verdict must be "based solely on legal evidence ... and entirely free from the taint of extraneous considerations and influences." *Ibid.; accord State v. Bey II, supra*, 112 *N.J.* at 75, 548 *A.*2d 846; *State v. Corsaro, supra*, 107 *N.J.* at 348, 526 *A.*2d 1046. Thus, any irregularity is presumptively prejudicial. *State v. Corsaro, supra*, 107 *N.J.* at 346, 526 *A.*2d 1046 (citation omitted); *State v. Auld* 2 *N.J.* 426, 432, 67 *A.*2d 175 (1949). The prejudicial impact of juror misconduct of the magnitude involved in this death penalty case is virtually irrebuttable. A new death penalty trial is required.

## VII

Next we address defendant's argument that the trial court erred in submitting the "murder-to-avoid-apprehension" aggravating factor to the jury because there was insufficient evidence to support a finding that the factor existed. *See N.J.S.A.* 2C:11–3c(4)(f). Defendant insists that the testimony of Christopher Forston was direct evidence that the victim was shot because she would not cooperate. That same argument was rejected in *State v. Hightower, supra*, 120 *N.J.* at 420, 577 *A.*2d 99.

The murder-to-avoid apprehension factor focuses on the reason that a defendant killed his or her victim. It requires proof that "[t]he murder was committed for the purpose of escaping detection, apprehension, trial, punishment or confinement for another offense committed by the defendant or another." *N.J.S.A.* 2C:11–3c(4)(f). The fact that a murder occurs contemporaneously with the witnessed underlying crime does not mitigate the evil of killing a potential witness. *State v. Hightower, supra*, 120 *N.J.* at 421, 577 *A.*2d 99. As this Court held, that aggravating factor may be submitted to the jury when

the State has produced sufficient evidence on which a jury can reasonably conclude that *at least one of the motives* of the defendant in killing his or her victim was to

eliminate a witness or avoid subsequent apprehension and prosecution for criminal acts. Such evidence may be either direct or circumstantial.

[*State v. Martini, supra,* 131 *N.J.* at 282–83, 619 *A.2d* 1208 (emphasis added); accord *State v. DiFrisco, supra,* 137 *N.J.* at 501, 645 *A.2d* 734.]

Applying that standard to the evidence produced by the State in the present case, we hold that the trial court properly found that there was sufficient evidence on which the jury could conclude that at least one of the motives for defendant's killing of the victim was to eliminate a witness or avoid apprehension. The following evidence bolstered a finding that the c(4)(f) aggravating factor existed: (1) after entering the store, defendant waited for the few customers inside to leave before committing the crime; (2) defendant turned the store sign from "open" to "closed" after all of the customers had exited the store to preclude other customers from entering; (3) defendant fired the first shot within inches of the victim's heart; (4) defendant fired the second shot after the victim began to holler; (5) defendant fired the third shot into the victim's brain; and (6) the robbery was committed during the day. Although we do not reject the possibility that one of the reasons defendant shot the victim may have been because he had become angry and frustrated due to her lack of cooperation, we find a substantial rational basis in the evidence for a reasonable jury also to infer that the defendant shot the victim so she would not live to testify as a witness against him or to assist the State in apprehending and prosecuting him.

We do, however, agree with defendant's argument that the jury charge on the c(4)(f) aggravating factor was insufficient in light of the c(4)(g) felony murder aggravating factor. We need not, however, address the issue of whether the charge was so deficient as to require reversal. On the retrial, the trial judge must properly instruct the jury regarding this aggravating factor. Further, we remind trial courts that when essentially the same evidence is used to support both the c(4)(f) and c(4)(g) aggravating factors, the guidelines set forth in *Bey II* must be followed and the jury must be warned not to double count evidence. *State v. Hightower, supra,* 120 *N.J.* at 422, 577 *A.2d* 99; *see State v. Rose,*

112 *N.J.* 454, 526–27, 548 *A.*2d 1058 (1988); *State v. Bey II, supra,* 112 *N.J.* at 174–77, 548 *A.*2d 887.

## VIII

We vacate defendant's death sentence and remand to the Law Division for a new penalty trial.

HANDLER, J., has filed a separate opinion concurring in part and dissenting in part, Point I of which O'HERN, J., joins.

HANDLER, J., concurring in part and dissenting in part.

Defendant, Jacinto Koger Hightower, whose conviction for murder has previously been affirmed by this Court, *State v. Hightower,* 120 *N.J.* 378, 577 *A.*2d 99 (1990) (*Hightower I* ), now appeals from the sentence of death imposed by a jury at his resentencing trial. The facts of the crime are reported in some detail in this Court's opinion on defendant's previous appeal, and in the majority's opinion.

Hightower's jury was on the verge of returning a verdict that would have resulted in a sentence of life imprisonment when the trial court intervened and removed the one juror poised to resist a death verdict. The juror had engaged in misconduct—he communicated extra-record information concerning the victim to the deliberating jury. I concur with the majority's conclusion that the trial court abused its discretion by removing that juror and reconstituting the jury with a substitute juror because the deliberations had proceeded too far. Because the information prejudiced only defendant, the Court's conclusion that the trial court should have declared a mistrial, and that as a result of the failure to declare a mistrial, defendant must, for a third time, be exposed to the death sentence is draconian. Other options were available to the court in dealing with this form of misconduct. The court could have allowed the juror to remain on the jury or direct a verdict of a life sentence. Not having done either, defendant irretrievably lost the opportunity of a final non-unanimous verdict and the

resultant life sentence. Fundamental fairness and constitutional precepts dictate that the death sentence be set aside and a life sentence imposed.

I dissent from this case for another reason. The majority concludes that the evidence below was sufficient to support an aggravating factor, c(4)(f), which involves a murder committed to avoid apprehension. To sustain that determination the majority has so stretched the meaning of c(4)(f) that it can be applied arbitrarily to virtually any felony murder.

I

A.

The facts relating to the juror misconduct issue are as follows:

On the second day of jury deliberations, at 2:55 p.m., the trial court announced receipt of the following note from the jury:

> Judge, it has come to our attention that one of the jurors has information and knowledge about this case beyond the scope of the evidence given in Court. We ask your direction in regard to this matter.

At the time the note was written, the jury had already spent approximately six and one-half hours deliberating. The court suspended deliberations and then proceeded to explore the nature and scope of the problem through individualized *voir dire* of the jury.

During the court's questioning of the jury foreman, several significant facts came to light. First, the court learned that Juror Number Seven told the rest of the jury that he had heard that the victim had three children. The foreman further explained the context that provoked Juror Seven's revelation:

> There was a fairly intense debate going on at that point in time where [Juror Seven] was taking a different position than some of the other people, and there was a fair amount of frustration from some other people about the position he was taking, and essentially he was—if I can characterize, he was getting backed into a corner, so to speak, or something like that and he was almost lashing out. This is the way that I read it, and saying, look, I know stuff.

The essential facts of this account were confirmed by the other jurors, although there was extensive confusion concerning the details of Juror Number Seven's comment. There was also significant confusion among the jury concerning the source of Juror Seven's information, and even whether Juror Seven divulged his source.

Juror Number Seven told the court that he overheard the information while food shopping earlier that week. He denied discussing the case with anyone, and even stated that he refused to speak about the case when approached by his son. Juror Number Seven explained the reason for his disclosure. He said:

> I told them I thought that he should get 30 years imprisonment.instead of the death sentence because it seems by his time in prison he could be a productive citizen when he comes out. Now, majority of them jumped me for that. . . . Well, they said, you must have heard something we didn't hear, and I says, all I overheard—I didn't discuss this with no one—was that the lady had three children. . . .

From the foreman, the court and counsel learned the true extent to which Juror Seven was alone in his view of the appropriate penalty. The foreman stated:

> Let me give you a little bit fuller context and trust that—I guess I can do that. [Juror Seven] was taking a different position than others in the room. . . . And it's frustrating to me because he has a point of view that deserves to be on the jury, and what I'm—what I'm afraid of is that if—jumping to a conclusion here—that he might be removed or replaced with an alternate or something like that, that his point of view gets lost.

The court also discovered that jury deliberations had reached a very late, if not conclusive stage at the time of the interruption. From the colloquy at the close of the previous day's deliberations it was apparent that the jury had entered the decision-making stages because it had already begun to mark the verdict sheet. During the course of the questioning the foreman explained:

> We have conducted a great jury deliberation and it's—and it's frustrating to me that at this—which was a fairly late point in our deliberation that this came out.

Juror Number Two further hinted at the advanced state of deliberations when, in answer to a question about whether the information that the victim had children would affect him, he replied "[a]s far as I'm personally concerned, no. I made up my

mind in a sense—whatever." Juror Number Three added to this impression by stating that the information would not affect her "because prior to [Juror Number Seven] saying that, we had already taken a straw vote." Finally, Juror Number Ten made a comment about "when we were voting on the mitigating circumstances. . . ." These comments demonstrate that the jury had advanced very far in its deliberations.

Significantly, counsel for the defense twice requested that the court inquire of the foreman as to what stage in the deliberative process the jury had reached when the information was revealed and once requested that the court poll the jurors individually as to their capacity to start deliberations anew with a substitute juror. The court refused to undertake those inquiries, expressing confidence in the jury's ability to restart its deliberations and to disregard its past conclusions as well as the irrelevant victim-impact evidence. The court thus denied the defense motion for a mistrial, and removed Juror Number Seven from the jury.[1] Juror Number Seven was replaced with an alternate juror, and the eleven old and one new jurors were told to begin deliberations anew.

The reconstituted jury commenced deliberations the following morning at 11:03 a.m. At 3:30 p.m., the jury returned a verdict sentencing Hightower to death. The new deliberations lasted four and one-half hours.

By Order, this Court unsealed the first jury verdict sheet. The markings on the sheet indicated that the jury had found both aggravating factors and had made findings on all of the fourteen mitigating factors. The only section of the sheet left unmarked

---

[1] The court made this ruling based on the fact that Juror Seven had revealed information learned outside of the court proceedings to the jury instead of immediately reporting the information to the court, as the jurors were instructed. Without providing any specific reason, the court stated its concern about Juror Seven's potential to engage in future misconduct. The court further stated its ruling was grounded in protecting the integrity of the process integrity that was threatened when the juror disobeyed the court's direct order.

was that reserved for the indication of the jury's ultimate conclusion on the sentence.

## B.

Extreme restraint and caution must be employed whenever a court acts in a fashion that might alter or influence jury deliberations. In *State v. Corsaro*, 107 *N.J.* 339, 526 *A*.2d 1046 (1987), the Court explained that "[i]n light of the centrality of jury deliberations to our criminal justice system, errors that could upset or alter the sensitive process of jury deliberations, such as improper juror substitution, 'trench directly upon the proper discharge of the judicial function.'" *Id.* at 347, 526 *A*.2d 1046 (citing *State v. Harper*, 128 *N.J.Super.* 270, 278, 319 *A*.2d 771 (App.Div.) (citation omitted), *certif. denied*, 65 *N.J.* 574, 325 *A*.2d 708 (1974)).

The majority correctly concludes that the trial court's decision to remove Juror Number Seven was an abuse of the court's discretion because the reasons for removal were not exclusively personal circumstances as required by *Rule* 1:8–2(d). *Ante* at 255–56, 680 *A*.2d at 656–57 (quoting *State v. Trent*, 157 *N.J.Super.* 231, 239, 384 *A*.2d 888 (App.Div.1978), *rev'd on other grounds*, 79 *N.J.* 251, 398 *A*.2d 1271 (1979)). After concluding that the trial court abused its discretion in removing Juror Number Seven, the majority significantly discounts or ignores the crucial factual circumstances of this case as well as the alternative remedies available to the trial court in holding that the only remedy was a mistrial.

Generally, when a juror has committed misconduct but removal and substitution is not a viable option, a trial court may consider either retaining the juror and providing a curative instruction, or declaring a mistrial. The court should apply the least drastic remedy, and the remedy which would least infringe on a defendant's right to a fair trial. As the majority correctly notes, in a capital cause, a court must be extremely cautious in guarding a defendant's fundamental right to fairness. Because of the unique circumstances in the present case, the majority's conclusion that a

mistrial would have been the appropriate remedy prior to any further *voir dire* on the jurors' ability to continue is incorrect and commits an injustice upon defendant that our system cannot tolerate.

A mistrial is warranted if juror misconduct "could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge." *Panko v. Flintkote Co.,* 7 *N.J.* 55, 61, 80 *A.*2d 302 (1951). The majority holds that "*any* irregularity [in the deliberative process] is presumptively prejudicial." *Ante* at 267, 680 *A.*2d at 663 (emphasis added) (citing *Corsaro, supra,* 107 *N.J.* at 346, 526 *A.*2d 1046 (citation omitted) (noting that errors of juror substitution are cognizable as plain error); *State v. Auld,* 2 *N.J.* 426, 432, 67 *A.*2d 175 (1949)). The majority also highlights that this standard must be strictly observed in the unique context of a death-penalty case where the stakes are extraordinary. Unfortunately, the majority does so only on an abstract level, ignoring the context and atmosphere that surrounded the deliberations of this jury when the misconduct arose.

In all cases, however, it is necessary to be mindful that a mistrial is an extreme remedy that should be invoked only as a last resort. Not only does a retrial result in a great expenditure of time, money, and judicial resources, *State v. Lipsky,* 164 *N.J.Super.* 39, 43, 395 *A.*2d 555 (App.Div.1978), but, in a capital prosecution when the jury is poised to return a verdict that would result in a life sentence, the remedy itself becomes a life-or-death decision.

## C.

A mistrial was neither the necessary nor the appropriate remedy in this case. The jury was not irremediably tainted as a result of its exposure to the collateral extra-record information and Juror Number Seven's conduct did not mandate his removal from the jury. Most significantly, prior to the introduction of the extra-

record information, the jury was poised to reach a non-unanimous verdict.

The trial court itself felt very strongly that the jury was sincere in reporting its ability to continue its deliberations. After conducting individualized *voir dire* of each juror regarding his or her ability to continue, the court concluded that the jury could resume deliberations without considering the improper disclosure of victim impact information. The inference is clear that the jury was not tainted by the extra-record information.

The trial court should have determined, though, that if a curative instruction was sufficient for the jury, it was also sufficient for Juror Number Seven. Juror Number Seven demonstrated that he had, in fact, disregarded the extra-record information. Indeed, the only juror for whom the trial court had direct proof as to whether the information had an effect is Juror Seven. Knowledge that the victim was survived by children, when combined with all the victim-impact inferences engendered by that fact, militates, if at all, toward the imposition of the death penalty. Juror Seven was, however, convinced that Hightower should be sentenced to life. Therefore, it is clear that the information to which Juror Seven was exposed did not manifestly affect his analysis of any of the issues before the jury.

Nor did Juror Seven's behavior amount to misconduct compelling his removal from the panel. This was not a traditional case of juror misconduct. Juror Seven overheard the information, he did not seek it out. The trial court did not find that the juror discussed the fact with others outside of the court. There is no evidence, nor did the court find, that the disclosure was deliberate or premeditated. Rather Juror Seven blurted out the statement as a result of difficult interaction with fellow jury members, in an improper but not ill-motivated attempt to defend his position. The disclosure was impulsive and intemperate, not calculated or designed. The pro-life juror did not reveal facts to sabotage the deliberations, but was actually defending his views by asserting the strength of his conviction despite his knowledge of extra-

record, pro-death facts. It was clear that Juror Seven could have prevented the imposition of the death sentence by simply withholding his vote. Instead, he chose to respect an affirmative obligation to deliberate, to attempt to convey his point of view to the other jurors so they could analyze and weigh his perspective. Finally, Juror Number Seven did not demonstrate contempt for the court, but was honest and forthright when confronted with his transgression. Because of the nature of his revelation and the context in which it was uttered, there was little likelihood that Juror Seven was going to repeat his behavior.

*State v. Ramseur,* 106 *N.J.* 123, 524 *A.*2d 188 (1987), is instructive in exploring the scope and the importance of the right to a life verdict. In *Ramseur,* the Court recognized that "the Legislature contemplated three possible final verdicts in a capital case": a unanimous verdict for death, a unanimous verdict for life, and a non-unanimous verdict that results in a life sentence. *Id.* at 301, 524 *A.*2d 188. The Court held that fundamental fairness requires courts to respect even the potential opportunity for a non-unanimous jury.

After four hours of deliberation, *Ramseur's* jury advised the trial court that the jury was "unable to reach a unanimous decision. Suggestions please." *Ibid.* The Court in *Ramseur* held that the note did not necessarily indicate a deadlocked jury. Rather, in seeking direction, the jury communicated that it could continue. However, the Court was aware of a *strong potential* for deadlock. The Court suggested that the trial court "should have explored with the jury whether it had deliberated sufficiently and had reached a genuine stalemate, a point at which further deliberations would have been counter-productive." *Id.* at 304, 524 *A.*2d 188. The trial court, however, made no attempt to discover whether further deliberations would be helpful. Rather, the trial court immediately gave an *Allen* charge. *Id.* at 305, 524 *A.*2d 188 (citing *State v. Czachor,* 82 *N.J.* 392, 402, 413 *A.*2d 593 (1980) (citing State law grounds and disapproving of traditional *Allen* charge); *Allen v. United States,* 164 *U.S.* 492, 17 *S.Ct.* 154, 41 *L.*

*Ed.* 528 (1896) (approving jury charge instructing jury that "it was their duty to decide the case if they could conscientiously do so" and "they should listen, with a disposition to be convinced, to each other's arguments")). The *Ramseur* Court held that the *Allen* charge had a potential to coerce the jury to return a unanimous verdict because the effect of telling the jury that it had to agree would undermine any likelihood it would disagree. *Ibid.* Because the jury may have ultimately returned a verdict for life had the coercive charge not been delivered, the Court reversed the death sentence. The Court held that the defendant could not be subjected to the death penalty in a second trial.

The trial court in this case faced a situation that paralleled that of the trial court in *Ramseur*: (1) the court was faced with strong evidence of the jury's "unwillingness to bring in an uncoerced unanimous verdict for the death sentence," *id.* at 313, 524 *A.*2d 188; (2) the trial court did not inquire into whether the jury had reached a stalemate or whether further deliberations would be helpful; and (3) error by the trial court prevented the court from discovering the effect of further deliberations.

Here, there are strong indications that the jury would not have been unanimous. As a result of the *voir dire,* the trial court knew that Juror Number Seven was poised to vote for life. Moreover, the court knew that Juror Number Seven was forcefully committed to that position. The court also knew that many, and possibly all of the other jurors had already made up their minds to return a death sentence. Indeed, the court was warned that if Juror Seven was removed from the panel, "his point of view gets lost." The court also knew deliberations were at a late stage and that the jury was experiencing great frustration with the strong-minded Juror Number Seven's commitment to advocate for life.

When a communication from the jury indicates that it may have reached a stalemate, a trial court should ascertain whether further deliberations would be helpful to the jury. *See State v. Hunt,* 115 *N.J.* 330, 380, 558 *A.*2d 1259 (1989) (citing *Lowenfield v. Phelps,* 484 *U.S.* 231, 240, 108 *S.Ct.* 546, 552, 98 *L. Ed.*2d 568, 579 (1988)

(approving of an inquiry about whether "further deliberations might assist them" after jury indicated an inability to reach a unanimous verdict)). In a capital case, this inquiry is crucial because a "stalemate" is a legitimate and acceptable conclusion of jury deliberations. In this case, the jury did not initially come to the court with a suggestion of impasse, but with a complaint about Juror Number Seven's introduction of extraneous information into deliberations. However, on learning the extent that the jury was divided at the very late stage of the deliberative process, the court had an obligation to inquire further. The court failed to ascertain whether the jury had reached a non-unanimous verdict prior to the misconduct or whether the misconduct was capable of tainting further jury deliberations.

In analyzing whether the initial jury had reached a non-unanimous verdict, the majority's opinion poses a foundational question drawn out of *Ramseur* and subsequent cases: Would further deliberations help the jury reach an uncoerced unanimous decision. *Ante* at 258–60, 680 *A*.2d at 658–59. In this case, the trial court had the unusual advantage of knowing who the holdout was. As a result, its inquiry into whether the power of persuasive argument had run its course need not have been overly abstract. Indeed, several comments made by Juror Number Seven and other members of the jury quite directly addressed the question of whether Juror Seven, the holdout, had reached an "honest conviction as to the weight or effect of the evidence" that further deliberations were unlikely to alter. *State v. Czachor*, 82 *N.J.* 392, 405 & n. 4, 413 *A*.2d 593 (1980) (recommending use of ABA Model Charge in criminal trials).

It is not necessary to establish, as the majority suggests, that Juror Number Seven would never have changed his mind. Such a burden could not be satisfied. More to the point, that burden need not be satisfied. Rather, we recognized the appropriate standard in *Ramseur* and subsequent cases: whether to justify the discontinuance of deliberations there was " 'a substantial likelihood,' that a non-unanimous verdict would have been re-

turned...." *Hunt, supra*, 115 *N.J.* at 381, 558 *A.*2d 1259 (quoting *Ramseur, supra*, 106 *N.J.* at 314, 524 *A.*2d 188). If there was, "we cannot require defendant to run the risk that a different jury might decide he should die." *Ibid.*

The majority's attempts to reconcile and distinguish *Ramseur* are not convincing. First the majority argues that the trial court did not abuse its discretion in determining that the original jury did not deliberate for a reasonable amount of time prior to reaching a deadlock. *Ante* at 258–59, 680 *A.*2d at 658–59. The majority points to the complexity of a trial involving the c(4)(f) (avoid apprehension) factor and the c(4)(g) (murder during the course of a robbery) factor. The majority also notes that the jury had to make a determination on defendant's mental state. However, the proofs in this trial were not as complex as suggested by the majority. Both the c(4)(f) and the c(4)(g) factors involved evaluation of the same evidence. *See* discussion, *infra* at 285–89, 680 *A.*2d at 672–74. Also, it was necessary to determine defendant's mental state in deciding the c(4)(f) factor. Finally, when Juror Number Seven interjected the extra-record information, the jury had deliberated six and one-half hours, inferentially an adequate time in view of the fact that the reconstituted jury, presumably starting its deliberations anew, reached a final verdict in four and one-half hours.

The majority also relies on the fact that, unlike in *Ramseur*, there was no note or direct admission of deadlock. Rather, the majority argues that the evidence was suggestive of continuing, intense debate. *Ante* at 258–60, 680 *A.*2d at 658–59. The distinction is unavailing. Although the issue of deadlock did not arise from an independent communication from the jury, there was actually more compelling evidence of deadlock here than in *Ramseur*. Aside from Juror Number Seven's plain statement in favor of imposing a life sentence, the strongest evidence that Juror Seven was emerging as the lone voice in support of a life sentence appears in the foreman's comment that Juror Number Seven "has a point of view that deserves to be on the jury, and ... I'm afraid

... that he might be removed ... [and] that his point of view gets lost." The foreman's comment strongly suggests that the jury was prepared and ready to agree to disagree to a non-unanimous verdict authorized under the capital-punishment statute.

The record is replete with additional evidence that deliberations had proceeded very far. The fact that jurors were still debating the issue is not necessarily indicative of the fact that minds were not made up or a decision was not reached. If Juror Seven was the only vote for life, and he was continuing to attempt to persuade the others to change their minds, serious debate would consequently follow.

Comments made by other jurors suggest that Juror Seven had, like Juror Number Two, made his decision, and would not be persuaded by any further argument to change his mind. Juror Number Ten, for example, stated that he had the impression that Juror Seven "pretty much had his mind made up" at an early stage of the discussions. The record demonstrates that jurors were "taking positions," that at least one juror other than Juror Seven had made up his mind, and that there was frustration at the position Juror Seven was taking. Therefore, there is a substantial likelihood that further deliberations would not have helped this jury reach uncoerced unanimity.

The jury had demonstrated a substantial likelihood of a non-unanimous verdict. The court was obligated to further investigate this potential. The absence of investigation in combination with the strong evidence that Juror Number Seven could have successfully remained on the jury, dictate that this Court must respect the potential for a life sentence as it did in *Ramseur*. Defendant may not, on remand, be exposed to the death penalty.

## II

The Court in this case endorses an expansive interpretation and application of the c(4)(f) aggravating factor. That factor enables a jury to impose a death sentence if the defendant committed the murder to avoid apprehension. The Court's understanding of

what may be encompassed by this aggravating factor has the potential to convert any felony murder into capital murder.

This is not the first time that I have written about the dangers inherent in a broad reading of c(4)(f). *See, e.g., Hightower I, supra,* 120 *N.J.* at 434–38, 577 *A.*2d 99 (Handler, J., dissenting). This case demonstrates even more clearly the dangers previously noted. I reassert the need to clarify and limit the standard governing the admissibility and use of evidence offered to prove c(4)(f), including restriction of its application to prior offenses unrelated to the murder itself. *Id.* at 437, 577 *A.*2d 99 (citing *State v. Monturi,* 195 *N.J.Super.* 317, 327, 478 *A.*2d 1266 (Law Div.1984) ("[T]he motive behind the murder must be the concealment of another prior offense, and the proofs must be limited to that issue.")). Most troubling, the presently vague and malleable standard for raising the c(4)(f) factor always permits the evidence supporting the felony murder factor, c(4)(g), to support the c(4)(f) factor. In other words, the c(4)(f) factor automatically duplicates the c(4)(g) factor. *Id.* at 437–38, 577 *A.*2d 99. At a minimum, in order to demonstrate sufficient evidence, the State must proffer factual evidence that is independently significant to each factor. Without any further statutory or judicial guidance to channel prosecutorial and jury discretion, however, the c(4)(f) factor clearly fails to satisfy constitutional mandates under the Eighth and Fourteenth Amendments.

The majority's finding of sufficient evidence to support the c(4)(f) aggravating factor substantially reduces the State's evidentiary burden, rendering the reasonable doubt standard worthless in its singular function to assure the principled imposition of the death sentence. The general and attenuated evidence, relied on by the State in arguing the factor, can be found in any felony murder. Yet, clearly not every felony murder can be treated as a capital case. More troubling, the indirect and equivocal circumstantial evidence can be shaped and directed, with equal force and conviction, to support different motives for murder. In finding the reasonable doubt standard satisfied by such amorphous evi-

dence, the majority dilutes the reasonable doubt standard to equate with no more than the preponderance of the evidence standard.

### A.

We have been over the facts many times: State witness Christopher Forston testified that soon after the murder, defendant described the crime to Forston. Defendant went to the Cumberland Farms store in Willingboro, New Jersey, just before noon on July 7, 1985, intending to commit a robbery. Defendant lingered in the store for a brief period until all of the customers left. Defendant then approached the sales counter, placed a box of Pampers on the counter, and asked for a carton of cigarettes. When the sales clerk, Cynthia Barlieb, turned away to get the cigarettes, defendant turned the store's open sign to closed and pulled out his gun. He demanded that Ms. Barlieb open the register. When she did not, he shot her in the chest. Ms. Barlieb fell, but then got back up. Defendant again told her to open the cash register. Ms. Barlieb again refused and "hollered or made a movement." Defendant shot her again, this time in the neck. Defendant then jumped over the counter and attempted to open the register himself. Unable to do so, he ordered Ms. Barlieb to show him how the machine opened. Forston testified that "she wouldn't show him so he kept messing with it and he ... started getting mad, and he jammed the cash register and he shot her again." The third shot hit Ms. Barlieb in the head. Forston testified further, that in response to Forston's question as to why defendant had killed Ms. Barlieb, defendant answered that he had done so because "the old bitch wouldn't cooperate."

The record reveals little credible evidence supporting the argument that in killing Barlieb defendant was motivated by a fear of future identification. First, defendant did not know Cynthia Barlieb. Moreover, while defendant's parents resided several blocks from the convenience store, defendant spent most of his time in Texas and Philadelphia. Nor did defendant attempt to

conceal his identity from Ms. Barlieb or other customers upon entering the store. For example, he did not wear a mask and he entered the store at a time when other customers were present. Additionally, there was no extended period of time prior to the shooting during which defendant and the victim were in contact.

The majority points to six aspects of the evidence in finding sufficient proof of the c(4)(f) factor. Two of the factors detail where defendant shot the victim—*i.e.*, the heart and the head. These facts imply *nothing* but an intent to kill. The majority also points out that the second shot was fired *after* the victim hollered. The first and third shots were not, however, fired in response to the victim's cries. Moreover, that the victim yelled after being shot is not proof of defendant's motive in shooting her. The majority also argues that the time of day supports a finding of the factor. The majority could just as easily point to a nighttime robbery as evidence of a murder with the intent to avoid apprehension. The fact that the robbery occurred during the day or the night, however, does not even arguably reveal defendant's intent. Finally, the majority asserts that defendant waited for the customers in the store to leave and turned the sign in the store window to the closed position. These actions are more readily explained as a desire to avoid a disturbance during the course of the robbery, and thus an intent to rob.

Significantly, there is compelling evidence that defendant killed Ms. Barlieb for another reason: she was not cooperating. Each shot occurred after a repeated request to gain the assistance of the clerk. Only when she refused to cooperate did defendant shoot her. On the other hand, the State's basis for the c(4)(f) factor, that defendant shot Ms. Barlieb to quiet her or to ensure that she would not later identify him, is not supported by anything more than speculation. Especially where a strong and clear alternative motive exists on the record, this Court must demand a showing of evidence supporting the c(4)(f) factor, whether circumstantial or direct, that rises above the level of speculation.

## B.

Although the United States Supreme Court has found that death is a constitutional punishment under the Eighth Amendment, the Court emphasized that "[death] is an extreme sanction, suitable to the most extreme of crimes." *Gregg v. Georgia*, 428 *U.S.* 153, 187, 96 *S.Ct.* 2909, 2932, 49 *L. Ed.*2d 859, 882 (1976). "Because of the uniqueness of the death penalty, . . . it [may] not be imposed under sentencing procedures that create[ ] a substantial risk that it [will] be inflicted in an arbitrary and capricious manner." *Id.* at 188, 96 *S.Ct.* at 2932, 49 *L. Ed.*2d at 883 (citing *Furman v. Georgia*, 408 *U.S.* 238, 313, 92 *S.Ct.* 2726, 2764, 33 *L. Ed.*2d 346, 392 (1972) (White, J., concurring)). Recognizing the inevitable inexperience of the jury in performing sentencing determinations as well as the complexity of the task, *id.* at 192, 96 *S.Ct.* at 2934, 49 *L. Ed.*2d at 885, the Supreme Court emphasized the need for a structured and "meaningful basis for distinguishing the few cases in which [death] is imposed from the many cases in which it is not." *Id.* at 188, 96 *S.Ct.* at 2932, 49 *L. Ed.*2d at 883 (citing *Furman, supra*, 408 *U.S.* at 313, 92 *S.Ct.* at 2764, 33 *L. Ed.*2d at 392 (White, J., concurring)).

Thus, "[t]o pass constitutional muster, a capital sentencing scheme must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield v. Phelps, supra*, 484 *U.S.* at 244, 108 *S.Ct.* at 554, 98 *L. Ed.*2d at 581 (quotation and citation omitted). One method of guiding the jury's decision making process, approved by the Supreme Court in *Gregg*, and adopted by the New Jersey Legislature and this Court in *Ramseur*, is through statutory aggravating and mitigating circumstances focusing the jury on the character of the defendant and the nature of the crime. *Gregg, supra*, 428 *U.S.* at 192–95, 96 *S.Ct.* at 2934–35, 49 *L. Ed.*2d at 885; *Ramseur, supra*, 106 *N.J.* at 197, 524 *A.*2d 188. This sentencing structure "pass[es] constitutional muster, [because it]: limit[s] imposition of the penalty to what is assumed

to be the small group for which is it appropriate ... and ensure[s] that the limited class selected for the penalty is chosen with rationality and consistency." *Ramseur, supra,* 106 *N.J.* at 183, 524 *A.*2d 188 (citations omitted).

Under our capital sentencing scheme, then, aggravating factors provide constitutionally necessary guidance for jury and prosecutorial discretion in determining for whom the penalty of death is the appropriate sanction. Because of the vital limiting role of the aggravating factors, the factors themselves must be sufficiently clear and precise. A vague or overly broad factor simply becomes a mask for unfettered sentencing discretion; it cannot effectively control, direct, or limit that discretion. The United States Supreme Court instructs that the test for the breadth of an aggravating factor is not whether the factor, on its face, can be interpreted too broadly, but whether the factor, as interpreted by the supreme court of the state, is sufficiently narrow. *Gregg, supra,* 428 *U.S.* at 201, 96 *S.Ct.* at 2938, 49 *L. Ed.*2d at 890 (noting that the "outrageously or wantonly vile" aggravating factor can be construed to incorporate any murder, but finding no evidence that the Georgia Supreme Court would adopt such a broad interpretation).

The c(4)(f) factor, by its terms and as interpreted by this Court, focuses on the defendant's purpose in killing. In *State v. Martini,* 131 *N.J.* 176, 619 *A.*2d 1208 (1993) (*Martini I* ), the Court explained: "[t]he key to finding factor c(4)(f) is that the defendant intended to eliminate a potential witness to his crimes." *Id.* at 281, 619 *A.*2d 1208; *see Hightower I, supra,* 120 *N.J.* at 420–21, 577 *A.*2d 99 (finding that " '[t]he gravamen of [the (4)(f) ] factor is the silencing of potential witnesses, which could be for the underlying crime being committed or for a crime committed at another time' ") (quoting *State v. James Moore,* 207 *N.J.Super.* 561, 569, 504 *A.*2d 804 (Law Div.1985)).

As noted by the majority, the Court has previously embraced expansive interpretations of the factor. First, the Court has held that the factor may include cases in which the crime that the defendant seeks to conceal is contemporaneous with the murder

itself. *Hightower I, supra,* 120 *N.J.* at 420, 577 *A.*2d 99. Second, the Court allowed application of the factor where the purpose of eliminating a witness was but one of several motives inducing the defendant to kill. *Martini I, supra,* 131 *N.J.* at 282, 619 *A.*2d 1208 (reasoning that "[n]othing in the language of the factor indicates that it was meant to apply only to those murders undertaken solely for the purpose of eliminating a witness"). Finally, although the Court has stated the trial court must "warn the jury not to double-count the evidence," it acknowledged that "the same evidence can support more than one aggravating circumstance." *Hightower I, supra,* 120 *N.J.* at 422, 577 *A.*2d 99.

The concern over double-counting of evidence is highlighted where, as here, the c(4)(g) (murder during a felony) and c(4)(f) aggravating factors are both charged. Given that criminals generally want to escape detection for their crimes, *Martini I, supra,* 131 *N.J.* at 283, 619 *A.*2d 1208, every defendant who commits murder during a rape, robbery, or other felony listed in c(4)(g), will automatically also be liable under an overly broad interpretation of c(4)(f). *Id.* at 281, 284, 619 *A.*2d 1208; *Hightower I, supra,* 120 *N.J.* at 422, 426, 577 *A.*2d 99. This Court has, however, determined that automatic duplication is not acceptable. *See Martini I, supra,* 131 *N.J.* at 281, 619 *A.*2d 1208 ("our refusal to construe c(4)(f) narrowly as requested by defendant does not mean that in all felony murders that circumstance will duplicate c(4)(g)"). "[T]he mere fact of a death is not enough to invoke this factor." *Hightower I, supra,* 120 *N.J.* at 422, 577 *A.*2d 99 (quotation omitted). Today's holding turns the rule against double-counting into an empty admonition.

To ensure that the c(4)(f) factor does not in fact duplicate c(4)(g), each factor must potentially cover some situation not covered by the other. Otherwise, the c(4)(g) factor would constitute a completely contained subset of the c(4)(f) factor, such that every c(4)(g) case is also a c(4)(f) case (*i.e.,* every murder during a felony could also be considered a murder to eliminate a witness to the felony). If duplication of charges or aggravating factors is

avoided only because each factor can cover some situations not covered by the other, that distinction between the factors must manifest itself in a distinction relating to the evidence relevant to the factors. If automatic duplication were accepted, then the c(4)(f) factor would have no potential to further narrow the death-eligible class of offenders. Rather, it would be present in every c(4)(g) case, and serve only to emphasize the blameworthiness of a felony murder offender rather than to distinguish between felony murder offenders.

The Court can preserve the c(4)(f) factor as distinct and not duplicative of the c(4)(g) factor. As noted above, the c(4)(f) factor exists when a defendant's decision to kill the victim arises, at least in part, out of a desire to escape prosecution. In other words, the c(4)(f) factor should not necessarily exist whenever a defendant both desires to escape prosecution (as all do) and murders during the course of another felony (the c(4)(g) factor). Rather, it must further be shown that the defendant killed the victim *because* the defendant desired to escape prosecution.

The majority's unsound and unexplained departure from our commitment to fairness and consistency in death-penalty convictions is highlighted by comparing the present adoption of a broad reading of the c(4)(f) factor to the extreme measures this Court found necessary in *Ramseur* to limit and confine the c(4)(c) factor, ensuring that it provided sufficient guidance in determining death eligibility. In *Ramseur,* the Court emphasized its commitment to "the goals of consistency and reliability in the administration of the capital punishment" despite the United States Supreme Court's apparent retrenchment in those areas. 106 *N.J.* at 190, 524 *A.*2d 188. The Court emphasized that "[i]n the context of the death penalty, where the demands for fairness and accuracy are heightened, the principles of consistency and reliability rise to constitutional dimension." *Ibid.*

The *Ramseur* Court faced a challenge to the c(4)(c) factor ("[t]he murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an

aggravated battery to the victim") similar to the present challenge to the c(4)(f) factor. There, the defendant alleged that the c(4)(c) factor was facially unconstitutional because it was so broad and vague it could not be construed in a manner that sufficiently guided the jury's discretion. The Court explained that the vagueness resulting from the construction of the aggravating factor "allows arbitrary and discriminatory enforcement of the laws by police, judges and juries." *Id.* at 201 n. 27, 524 *A.*2d 188. The result was to render "the jury's functioning unpredictable. In this context, a vague sentencing guideline, by rendering the determination more inscrutable to judicial review, increases the chance for concealed prejudice in sentencing." *Ibid.* Recognizing both its "power and obligation to narrow imprecise statutory language in order to render it constitutional," *id.* at 200, 524 *A.*2d 188 (citations omitted), the Court found that "the narrowing [of the c(4)(c) factor] is essential to satisfy the requirement of *Gregg* that the discretion of the jury be adequately controlled and the requirement of the fourteenth amendment that criminal laws not be vague." *Id.* at 200–01, 524 *A.*2d 188.

Therefore, the Court painstakingly delineated each term of the factor, including "torture" and "depravity of mind." The Court also defined and emphasized the need for both purposeful and knowing commission of the factor, providing clear examples of boundaries that trial courts were to respect. Wary of the fact that intent often must be demonstrated with circumstantial evidence, and that mere speculation could not provide a finding of a factor of such import beyond a reasonable doubt, the Court held that "pain in fact" is required to establish the existence of the factor. Therefore, the Court held that the death penalty could not be imposed "where no pain was suffered despite the murderer's intent to inflict it ... [because the State could not tolerate] discretionary findings and death sentences based on the slimmest of evidence." *Id.* at 208, 524 *A.*2d 188. "[T]he extreme physical or mental suffering must be precisely what defendant *wanted* to occur in addition to death." *Id.* at 208–09, 524 *A.*2d 188. The Court further limited the factor to require both a knowing and

purposeful state of mind, holding that the factor could not be found even if a defendant, although " 'practically certain' that extreme physical or mental suffering would occur, did not have that result as his 'conscious object.' " *Id.* at 209 n. 35, 524 *A.*2d 188. Thus, the Court "provide[d] further assurance that this aggravating factor will apply only to the most culpable murder." *Ibid.*

Yet, in contrast, the Court today indifferently accepts a standard for the avoid apprehension factor that allows that factor to be raised in all felony murder cases. Some restrictive applications may be imposed by individual courts, prosecutors, or juries in given felony murder cases. But that type of unprincipled application and unguided discretion "allows arbitrary and discriminating enforcement of the laws by police, judges and juries." *Id.* at 201 n. 27, 524 *A.*2d 188. A limitation that is random, unstructured, and unprincipled is not sufficient, in a system demanding guided discretion, to ensure constitutional administration of the gravest sanction for the most serious of crimes.

## C.

Study of previous rulings by this Court regarding the sufficiency of the evidence supporting the c(4)(f) factor suggests that the Court was aware of the need to establish a causal connection between the murder and the desire to escape prosecution. Thus, the Court focused on evidence tending specifically to demonstrate the formation of a pre-murder intent to eliminate a witness to some underlying felony. Credible and persuasive evidence establishing the c(4)(f) factor has included admissions of motive as well as proof of a prior relationship between the defendant and victim or an extended period of exposure, prior to the murder, during which the victim could study the defendant's appearance for subsequent identification.

For example, in past cases affirming the c(4)(f) factor, the Court has relied on the confession of the defendant that the purpose for the murder was to escape prosecution for that or some other

crime. *See, e.g., State v. DiFrisco,* 137 *N.J.* 434, 500–02, 645 *A.*2d 734 (1994) (*DiFrisco II* ) (noting defendant's statement that he killed victim to eliminate witness to procurer's criminal activity); *Martini I, supra,* 131 *N.J.* at 280, 619 *A.*2d 1208 (noting that defendant informed victim's wife that defendant was wanted by the authorities for a prior murder and later confessed that he murdered victim because "I thought he was going to run away"); *State v. Rose,* 112 *N.J.* 454, 531, 548 *A.*2d 1058 (1988) (affirming factor where only evidence of defendant's motive was his own statement that he panicked and did not want to be caught with shotgun).[2] Additionally, the Court in *Martini I* affirmed a finding of sufficient evidence to support the c(4)(f) factor, finding "most persuasive the fact that the victim had been acquainted with defendant and was in his presence for an extended period of time during which defendant's identity was not disguised." 131 *N.J.* at 283, 619 *A.*2d 1208. The Court further noted that "no apparent purpose was served by [the] murder except for defendant's escape from detection." *Id.* at 284, 619 *A.*2d 1208. In respect of evidence showing that defendant attempted to elude police, the Court stated:

> The steps that defendant took to avoid apprehension, including his eluding police after picking up the ransom money, also shed light on his motive for the murder. True, as defendant argues, everyone who commits a felony seeks to avoid detection. Standing alone, those circumstances may not support application of the factor. However, when a jury views those circumstances along with the victim's familiarity with defendant, it could reasonably infer that the defendant firmly intended to escape and that the elimination of Flax was essential to the fulfillment of that objective.

[*Ibid.*]

---

[2] *See also Miller v. State,* 269 *Ark.* 341, 605 *S.W.*2d 430, 439–40 (1980), *cert. denied,* 450 *U.S.* 1035, 101 *S.Ct.* 1750, 68 *L. Ed.*2d 232 (1981); *People v. Davis,* 794 *P.*2d 159, 187–88 (Colo.1990), *cert. denied,* 498 *U.S.* 1018, 111 *S.Ct.* 662, 112 *L. Ed.*2d 656 (1991); *Wuornos v. State,* 644 *So.*2d 1012, 1019 (Fla.1994), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 1708, 131 *L. Ed.*2d 568 (1995); *State v. McCollum,* 334 *N.C.* 208, 433 *S.E.*2d 144, 149–50 (1993), *cert. denied,* —— *U.S.* ——, 114 *S.Ct.* 2784, 129 *L. Ed.*2d 895 (1994); *Grasso v. State,* 857 *P.*2d 802, 809 (Okla.Crim.App.1993).

This Court has identified the standard governing submission of aggravating factors to the jury. *See Hightower I, supra,* 120 *N.J.* at 420, 577 *A.*2d 99 (holding that the "State must provide evidence from which jury could rationally conclude beyond a reasonable doubt that" the aggravating factor is present); *see also Martini I, supra,* 131 *N.J.* at 282–83, 619 *A.*2d 1208 (holding that "aggravating factor c(4)(f) may be submitted to the jury when the State has produced sufficient evidence on . which a jury can reasonably conclude that at least one of the motives of the defendant in killing his or her victim was to eliminate a witness or avoid subsequent apprehension and prosecution for criminal acts"). Yet, in this case, the majority neither acknowledges the absence of factual support similar to that found in prior cases affirming the c(4)(f) factor, nor attempts to account for the Court's dramatic expansion of the factor in the present case.

The need for further narrowing is additionally supported by decisions of other jurisdictions. For example, many courts refuse to allow evidence that the victim was able to observe the defendant, in and of itself, to support the avoid apprehension factor. *See, e.g., People v. Bigelow,* 37 *Cal.*3d 731, 209 *Cal.Rptr.* 328, 331–32, 691 *P.*2d 994, 997–98 (1984) (finding argument that murder was committed to avoid apprehension was "totally speculative" where defendant hitchhiked a ride with victim, took victim to a remote location, shot victim, and drove away with his car); *Hansbrough v. State,* 509 *So.*2d 1081, 1086 (Fla.1987) (holding that "the mere fact that the victim might have been able to identify her assailant is not sufficient to support finding this factor"); *State v. Williams,* 304 *N.C.* 394, 284 *S.E.*2d 437, 455–56 (1981) (requiring direct evidence of motive to avoid apprehension and finding insufficient evidence of motive where defendant killed convenience store clerk and attempted to escape in an inconspicuous fashion), *cert. denied,* 456 *U.S.* 932, 102 *S.Ct.* 1985, 72 *L. Ed.*2d 450 (1982); *Commonwealth v. Daniels,* 537 *Pa.* 464, 644 *A.*2d 1175, 1179 (1994) (requiring direct evidence to support the avoid apprehension factor and holding that the State's burden "will not be met by simply showing that an individual who witnessed a murder or other felony commit-

ted by a defendant was also killed by the defendant"); *State v. Branam,* 855 *S.W.*2d 563, 570 (Tenn.1993) (holding that even though victim knew defendant and victim sounded her car horn after the first shot, there was no evidence beyond speculation to support the contention that the murder was committed to avoid apprehension for the robbery).

Courts in other states frequently require the production of very focused evidence of intent to eliminate a witness in order to justify submission of such a factor to the jury. *See, e.g., Hannon v. State,* 638 *So.*2d 39, 43–44 (Fla.1994) (holding that "when a murder victim is not a police officer, '[p]roof of the requisite intent to avoid arrest and detection must be very strong.'") (quotation omitted), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 1118, 130 *L.Ed.*2d 1081 (1995). Exemplary of the specific kind of evidence offered in support of the analogous aggravating factor in other states is evidence that a defendant removed the victim to a remote location before the killing, *see, e.g., Preston v. State,* 607 *So.*2d 404, 409 (Fla.1992), *cert. denied,* 507 *U.S.* 999, 113 *S.Ct.* 1619, 123 *L. Ed.*2d 178 (1993); *Munson v. State,* 758 *P.*2d 324, 335 (Okla.Crim.App. 1988), *cert. denied,* 488 *U.S.* 1019, 109 *S.Ct.* 820, 102 *L. Ed.*2d 809 (1989); that a defendant killed or attempted to kill more than one person who witnessed an underlying offense, *see, e.g., Pickens v. State,* 292 *Ark.* 362, 730 *S.W.*2d 230, 234, *cert. denied,* 484 *U.S.* 917, 108 *S.Ct.* 269, 98 *L. Ed.*2d 226 (1987); *Hannon, supra,* 638 *So.*2d at 43–44; *State v. Simants,* 197 *Neb.* 549, 250 *N.W.*2d 881, 891, *cert. denied,* 434 *U.S.* 878, 98 *S.Ct.* 231, 54 *L. Ed.*2d 158 (1977); *State v. Green,* 321 *N.C.* 594, 365 *S.E.*2d 587, 595–96, *cert. denied,* 488 *U.S.* 900, 109 *S.Ct.* 247, 102 *L. Ed.*2d 235 (1988); that a defendant was acquainted with the victim, *see, e.g., Wainwright v. State,* 302 *Ark.* 371, 790 *S.W.*2d 420, 427 (1990), *cert. denied,* 499 *U.S.* 913, 111 *S.Ct.* 1123, 113 *L. Ed.*2d 231 (1991); *Riley v. State, supra,* 366 *So.*2d at 22; *State v. Palmer,* 224 *Neb.* 282, 399 *N.W.*2d 706, 726 (1986), *cert. denied,* 484 *U.S.* 872, 108 *S.Ct.* 206, 98 *L. Ed.*2d 157 (1987); *Roberts v. State,* 868 *P.*2d 712, 722 (Okla.Crim. App.), *cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 158, 130 *L. Ed.*2d 96 (1994); or that the victim attempted to escape during the crime

and was killed at the time of the attempted escape. *See, e.g.,*
*Young v. State,* 579 *So.*2d 721, 724 (Fla.1991), *cert. denied,* 502
*U.S.* 1105, 112 *S.Ct.* 1198, 117 *L.Ed.*2d 438 (1992); *People v.*
*Williams,* 97 *Ill.*2d 252, 73 *Ill.Dec.* 360, 369, 454 *N.E.*2d 220, 229
(1983), *cert. denied,* 466 *U.S.* 981, 104 *S.Ct.* 2364, 80 *L.Ed.*2d 836
(1984); *State v. Smith,* 868 *S.W.*2d 561, 580 (Tenn.1993),
*cert. denied,* —— *U.S.* ——, 115 *S.Ct.* 417, 130 *L.Ed.*2d 333 (1994).

### D.

The majority's error stems from its deficient interpretational
definition of the c(4)(f) factor. After reciting the statutory defini-
tion of the factor, the majority notes that we have accepted a
broad interpretation of c(4)(f), requiring that the jury need find
only that "one of the motives of the defendant in killing his or her
victim was to eliminate a witness or avoid subsequent apprehen-
sion and prosecution for criminal acts." *Ante* 267–68, 680 *A.*2d at
663.

The majority's definition, however, is woefully incomplete. The
majority's interpretation of the avoid apprehension factor violates
the Eighth Amendment prohibition against cruel and unusual
punishment because, when accompanied by the felony murder
factor, the avoid-apprehension factor fails to provide any further
basis for distinguishing deathworthy offenders as instructed under
the *Furman* doctrine. The "narrowing" construction adopted by
the majority, however, is blatantly ineffective and does not even
provide a facially objective means of isolating the c(4)(f) factor.
The majority's interpretation of the factor thereby tolerates the
automatic duplication that it rejected in *Martini I.* Consider, the
Court recognized that it is almost always possible to argue that a
defendant who commits a felony also desires to avoid apprehen-
sion. Moreover, the Court will allow a finding of the c(4)(f) factor
even where the evidence demonstrates an alternative motive and
no specific evidence demonstrates that the murder was committed
for the purpose of avoiding apprehension. Thus, the factor is so
malleable that it can be found in any case. Without any guide-

lines, there is no basis for the State to make rational and consistent determinations in charging the factor, and no basis for a deliberating jury to accept or reject the State's argument. If the c(4)(f) factor can be raised in all c(4)(g) cases, but the State does not raise it in every case, the death selection process is under the arbitrary control of the State.

This unintentional delegation of discretion has serious consequences. First, a prosecutor charging the c(4)(f) factor can introduce prejudicial evidence that would not otherwise be admissible, except to establish, by circumstantial evidence, that the motive was to avoid apprehension. Further, merely charging a second aggravating factor undoubtably increases the likelihood of death. *State v. Harris*, A–108–95, Proportionality Review Study, Tables 8 & 9. A jury is more likely to punish a defendant charged with numerous aggravating factors. Additionally, because there are no clear guidelines or established rules about when c(4)(f) applies, the prosecutorial discretion also exposes the defendant to increased jury discretion. The bias of the additional factor is clearly weighted towards death. Without further limitation, the factor "allow[s] for standardless and arbitrary application of the law by prosecutors and juries." *Ramseur, supra,* 106 *N.J.* at 198, 524 *A.*2d 188.

### III

I join in the Court's decision to reverse Hightower's death sentence because the trial court abused its discretion in removing Juror Number Seven from the jury and because deliberations had gone too far for substitution and reconstitution of the jury. However, this Court's determination that the trial court should have granted a mistrial is wrong. Under the circumstances, defendant was denied the realistic opportunity for a non-unanimous verdict. Defendant should not again be exposed to a death sentence and subjected to another penalty trial. Additionally, the Court's expansive interpretation of the c(4)(f) aggravating factor and its tolerance of duplicative, overlapping evidence sanctions discretion that is insufficiently guided, and will inevitably result in the

arbitrary, discriminatory, and unconstitutional application of the death penalty.

Therefore, I respectfully dissent.

*For reversal and remandment*—Justices POLLOCK, GARIBALDI, STEIN and COLEMAN—4.

*For concurrence in part, dissent in part*—Justices HANDLER and O'HERN—2.