290 N.J. Super. 336 (1996)
675 A.2d 1143
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WALTER SINGLETON, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 20, 1996.
Decided April 30, 1996.
*338 Before Judges LONG, MUIR and LOFTUS.
Claudia Van Wyk, Deputy Public Defender argued the cause for appellant (Susan L. Reisner, Public Defender, attorney).
Marcy H. Geraci, Deputy Attorney General, argued the cause for respondent (Deborah T. Poritz, Attorney General, attorney).
The opinion of the court was delivered by LONG, P.J.A.D.
Tried to a jury, defendant, Walter Singleton was convicted of third-degree burglary, contrary to N.J.S.A. 2C:18-2(a)(1). He was sentenced to an extended term of ten years with a five year period of parole ineligibility. The trial judge also imposed appropriate Violent Crimes Compensation Board and Safe Neighborhood Services Fund assessments.
Defendant appeals, contending that the following trial errors warrant reversal:
POINT I:
THE ADMISSION OF TESTIMONY THAT DEFENDANT COMMITTED AN UNCHARGED CRIMINAL TRESPASS THE DAY BEFORE THIS INCIDENT *339 AT THE SAME APARTMENT BUILDING, WITHOUT ANY THEORY OF ADMISSIBILITY OR LIMITING INSTRUCTION, VIOLATED HIS RIGHTS UNDER N.J.R.E. 404b AND HIS RIGHT TO DUE PROCESS OF LAW (U.S. CONST.AMEND. XIV; N.J. CONST. (1947), ART. I, ¶ L) (Not Raised Below).
POINT II:
BECAUSE THE EVIDENCE THAT DEFENDANT WAS NOT A THIEF BUT A SQUATTER "CLEARLY INDICATED" A RATIONAL BASIS FOR THE LESSER INCLUDED OFFENSE OF CRIMINAL TRESPASS, THE JUDGE'S FAILURE TO SUBMIT THAT OFFENSE DEPRIVED DEFENDANT OF HIS RIGHT TO DUE PROCESS OF LAW.
POINT III:
THE JUDGE'S DISMISSAL OF A JUROR WHO WAS NOT A NATIVE SPEAKER OF ENGLISH BUT WHO WAS ABLE TO EXPLAIN THAT HIS DISAGREEMENT WITH THE OTHER ELEVEN JURORS STEMMED FROM HIS REASONABLE DOUBTS ABOUT AN ELEMENT OF THE OFFENSE, AND THE JUDGE'S SUBSTITUTION OF ANOTHER JUROR INSTEAD OF A DECLARATION OF MISTRIAL, VIOLATED DEFENDANT'S RIGHT TO BE TRIED BY A FAIR AND IMPARTIAL JURY (U.S. CONST. AMEND. VI, XIV; N.J. CONST. 1947, art. I, ¶ 9).
POINT IV:
THE JUDGE'S IMPOSITION OF A DISCRETIONARY EXTENDED TERM AUTOMATICALLY UPON FINDING THE STATUTORY PREDICATE, AND HIS IMPOSITION OF THE MAXIMUM BASE TERM AND MANDATORY MINIMUM AVAILABLE, VIOLATED THE CODE OF CRIMINAL JUSTICE AS CONSTRUED BY THE SUPREME COURT AND SHOULD SHOCK THE JUDICIAL CONSCIENCE.
We have carefully reviewed this record in light of these contentions and have concluded that the errors raised in Points II and III of defendant's brief operated to deny him a fair trial. Thus, we reverse and remand.

I
The evidence at trial established the following facts. Willie Moore owns a four unit apartment building in Trenton. There is one apartment on the first floor; two on the second; and, one on the third which is occupied by Stanley Gant.
On January 26, 1994, the day before the incident in question, "some time in the early morning hours" Moore received a report that someone had broken into the vacant apartment on the second floor which had previously been occupied by Willie Robinson. When Moore arrived he discovered that the door to that apartment *340 had been broken open. When he entered the apartment Moore found defendant asleep. Moore asked defendant to leave, but because defendant "seemed a little lethargic and a little disoriented," Moore called the police. The police escorted defendant from the building. Moore did not "press charges," a decision which he later regretted. The police "admonished [defendant] and rebuked him very severely," after which "they let him go." Moore then fixed the broken door.
On January 27, 1994, the second floor resident, George Smith, heard someone walking in the supposedly vacant apartment next door. He found that the door had been broken open. He also observed that the door to Gant's third-floor apartment had been broken, and heard a noise coming from that apartment as well. Knowing that Gant was visiting his girlfriend up the street, Smith went to notify him.
Upon returning to the building, Gant saw the two broken doors. He observed defendant standing inside his apartment at the top of the stairs. Defendant had "a few items in his hand," including an electrical appliance and a bowl of "oatmeal or something," which he was eating. Gant's apartment had been "ransacked pretty bad" as if someone had been looking for something.
Gant testified that when he entered the apartment, he saw that his television had been removed from its stand in the bedroom and placed on the floor at the top of the stairs. (The jury was shown a photo of the TV set on its stand). Also, his iron had been removed from its usual place on the floor under a counter and was on top of the counter. Gant also saw "some paper that was burnt at the top of the stairs like someone was starting a fire." When Gant asked defendant to leave, defendant "kept mumbling" that he was not "going anywhere" and that he "didn't want to leave." Defendant "kept saying that this was my cousin's apartment or something, something like that." Gant knew that defendant was referring to Vernard Moore, who was Gant's cousin and was also defendant's cousin and who had resided with Gant until about three weeks before this incident.
*341 Officers Martin and Montez responded to the scene at about 12:56 a.m. on January 27. As Martin arrived, defendant was walking out of the building. Gant identified defendant as the one he had found in his apartment, and Martin placed defendant under arrest. Defendant told Martin that his name was Michael Smith, but Martin later determined his real identity.
Upon searching the apartment, Martin saw the television on the floor at the top of the stairs and the iron on top of the kitchen counter. Martin confirmed that two doors had been broken. Defendant did not testify. Defense counsel called Officer Montez who testified that Gant's apartment had no light bulbs or working lights. In addition, he substantially corroborated Officer Martin's testimony except that he stated that the television was not at the top of the stairs but inside the apartment near the bedroom door. On this evidence the jury convicted defendant. This appeal followed.

II
We turn first to the trial judge's failure to instruct the jury as to criminal trespass. Burglary requires three elements of proof: (1) purpose to commit an offense; (2) entry into a structure; and (3) absence of license or privilege to enter. N.J.S.A. 2C:18-2(a). The relevant portion of the criminal trespass statute (N.J.S.A. 2C:18-3(a)) requires two elements, which are the same as the second and third elements of burglary. In a burglary case, if the State attempts to prove that the entry was for the purpose of stealing, the trial judge normally should charge the lesser included offense of criminal trespass, "in case the State should fail to convince the jury of larcenous intent." State v. Clarke, 198 N.J. Super. 219, 225, 486 A.2d 935 (App.Div. 1985) (dictum).
When there is a "rational basis" for a verdict on a lesser included offense, the judge must grant a defendant's request for a jury charge on that offense. N.J.S.A. 2C:1-8(e); State v. Crisantos (Arriagas), 102 N.J. 265, 277, 508 A.2d 167 (1986). Where, as here, a defendant fails to request the charge, the test is more *342 stringent: the judge must charge a lesser included offense only if the evidence "clearly indicates" that such a charge is appropriate. State v. Purnell, 126 N.J. 518, 541, 601 A.2d 175 (1992); State v. Choice, 98 N.J. 295, 299, 486 A.2d 833 (1985). The judge has no duty "to meticulously sift through the entire record" to uncover some facts that might support a lesser included offense instruction. State v. Purnell, supra, 126 N.J. at 540-41, 601 A.2d 175; State v. Maiorana, 240 N.J. Super. 352, 364-65, 573 A.2d 475 (App.Div. 1990), certif. denied, 127 N.J. 327, 604 A.2d 601 (1991).
Our task, therefore, is to determine whether the evidence before the judge clearly indicated that the trespass charge was warranted. In our view it was. The judge did not have to sift through the evidence in this case to uncover facts to support a trespass charge. On the contrary, the viability of such a charge was clearly indicated. Defendant, who appears to have been homeless, apparently broke into a vacant apartment in the building to sleep on the night before the crime charged. At that time, he was lethargic and disoriented and the owner of the building did not press charges against him. One night later, defendant was found in Gant's apartment, one floor up, eating a bowl of oatmeal. Gant testified that the apartment was ransacked as if someone was looking for something. In view of the fact that the apartment was entirely without a light source, a jury could well conclude that this is how defendant found the cereal, the bowl, the spoon and the cord Gant said he saw in defendant's hand. When Gant confronted defendant, he did not run away but insisted that he wasn't going anywhere because this was his cousin, Vernard Moore's apartment. Vernard Moore is also Gant's cousin. He had lived in Gant's apartment for six months, vacating it about three weeks before the incident. Also Gant testified that defendant had visited a former tenant, Willie Robinson in the apartment downstairs in which he had been found the previous night. Given defendant's rather confused state as testified to by Moore and Gant, it seems to us that there was ample evidence that defendant was in Gant's apartment for a purpose other than to steal, the most likely being *343 to get in out of the cold January night. To be sure the testimony as to the ransacking and the movement of the iron and the TV would also support submitting the burglary charge to the jury. However, the trespass charge was also essential.

III
Defendant also argues that his right to a trial before an impartial jury was subverted when the trial judge dismissed one of the jurors during deliberations. This was juror number five, Mr. Despeines. During jury selection Despeines was accepted without any expressed concerns about his facility with English. He coherently answered all the simple voir dire questions, although he apparently was not completely fluent in expressing himself in English ("I be in to work at four o'clock.")
The jury began to deliberate at about 2:00 p.m. on July 14, 1994. At 5:10 p.m. the judge sent the jurors a note asking if they wished to continue or return the next day. Up to that point, the jurors had apparently not experienced a sufficient problem with Despeines to warrant their alerting the judge to it. In response to the judge's inquiry, the jury sent back a written response: "We will return. We have a juror who cannot reach a decision because he can't `condemn anyone' for profoundly religious beliefs, and is unable to pronounce a guilty or not guilty verdict. Would this have had a bearing on his service to this jury." The note did not make any reference to defendant's inability to speak or understand English. The judge called Despeines into chambers and questioned him in detail about his ability to perform as a juror. Their colloquy in its entirety is as follows:
THE COURT: Could you come in, please Mr. Despeines, and sit right there.
JUROR NO. 5: Yes sir.
THE COURT: It's been brought to my attention that you cannot make a decision because you can't condemn anyone for profoundly religious beliefs, and that you're unable to pronounce a guilty or a not guilty verdict. Is that correct?
JUROR NO. 5: Oh.
THE COURT: Excuse me?

*344 JUROR NO. 5: Everything you read not all I said. I just said I find he's guilty because broke in the apartment to get in, because 
THE COURT REPORTER: Judge, I am not understanding the juror.
THE COURT: I can't understand it either.
JUROR NO. 5: I said it is by the owner said, you know, he not like a tenant, he don't belong to the apartment, and that he broke the law to get in the apartment. And also if he had to go to the apartment because he said he had his cousin live there, I think he got the second 
THE COURT REPORTER: Judge, I am not understanding.
THE COURT: I'm not asking you to justify your thinking.
JUROR NO. 5: Okay.
THE COURT: I'm just asking you to answer the question, it is your position because of religious beliefs that you cannot make a decision?
JUROR NO. 5: Okay. It's not because of religious, I just said to my jury, I been study in four different Bible, I can make a right judgment, what's right or what's wrong. I said for me it's wrong because to get to the apartment with no permission, first of all. And for the food eating, I would not condemn him for eating the food because if he eat the food because he's hungry, I will give him the warning, and stay fifty feet away from the apartment. Next I find you there, it would be stricter jail. That was what I saying. And he said do you have any belief, like if you were, if you were the 
THE COURT REPORTER: Excuse me?
THE COURT: Religious?
JUROR NO. 5: Religious. I say, yes, I grow up since a little boy and now, I, I do believe in God. I do believe in the law, what is right to do, and stand by the law. And I will do everything the law tell me to do. And that I will say, I can give you my decision, what you're thinking.
THE COURT: I don't want your decision. I will ask you for the third time. I've been asking you a question and you don't answer it.
JUROR NO. 5: Oh.
THE COURT: Is it your position that you cannot condemn anyone and that you, therefore, cannot make a decision as to guilt or innocence?
JUROR NO. 5: Yeah, I can make it. What I'm saying, what she wrote right here, I didn't say that, all of them. I just said what I told you, what you hear what I said.
THE COURT: Do you have religious beliefs that prevent you from making a decision?
JUROR NO. 5: No. Not to make a decision. I can make a guilty or not guilty.
THE COURT: Did you understand the trial?
JUROR NO. 5: Yes.
THE COURT: Did you understand my jury instruction when I gave the law?
JUROR NO. 5: Yes.
THE COURT: When I gave the law to the jury.

*345 JUROR NO. 5: Yes. And they said we all of them have to say guilty or not guilty, whatever else 
THE COURT: That's right, I said that. It has to be unanimous.
JUROR NO. 5: And say, I just feel the way it's supposed to happen, I said I agree altogether, I said I agree altogether no right to get into the apartment. And after we come into the second one, because they said he have the item 
THE COURT REPORTER: Excuse me?
THE COURT: Well, look, I don't want you to tell me what you're thinking or what the other jurors are thinking. I just want to resolve this matter. I've been told that you can't make a decision because of religious beliefs and because you have said, "I cannot condemn anyone."
JUROR NO. 5: Right, I said I cannot condemn anyone. Because I said, I just vote for him saying not guilty, and I would explain to them the way I find him he's not guilty. And, yes, he's guilty. And I say, no, he's not guilty. But I would say, I found the first part is guilty because he get to the apartment without permission of the owner. That's what I said. And then second part, I say, in the pictures 
THE COURT REPORTER: Excuse me?
JUROR NO. 5: In the photograph. There the police say he find him with something in his hand, with cereal. They find him empty-handed. And if no pictures of the floor for the TV, and I didn't see the picture of the TV in the pictures on the stand because all this missing. And the picture for the room is mistaken, because you should give a full profile of the room look like.
THE COURT: Okay. could you step out, please.
JUROR NO. 5: Yes.
(Juror No. 5 is excused from chambers).
What followed was an exchange between the judge and counsel.
THE COURT: He says guilty for the first part and not guilty for the second part. The first part is the burglary and the second part is eating cereal, which is no part of this case. He doesn't have the slightest idea, in my opinion, what is going on.
MS. LYONS: I think what he is saying with regard to the second part as you read it to them with the theft, the theft part of it.
THE COURT: Oh, maybe.
MS. LYONS: He's suggesting that he had, he had a bowl in his hand eating the oatmeal and he couldn't find that's theft.
THE COURT: But what he doesn't understand, that it doesn't have to be a theft, it's entering purpose of committing a theft therein.
MS. LYONS: But the two elements you gave, judge, was one and two.
THE COURT: I described what theft meant to them.
MS. LYONS: So, I mean, I think the critical question is 
THE COURT: Is he capable.
MS. LYONS: Because of religious belief. I mean, that's what the question is.

*346 MR. MEIDT: Well, his religious belief, he thinks he's guilty, but he almost wanted to give the guy a second chance.
THE COURT: He pronounced his own law, that he can't come within fifty feet of it again or if you do, I'll put you in jail.
MR. MEIDT: It doesn't seem he's able to follow the law as the Court instructed.
THE COURT: For the record, the Court Reporter had a very difficult time in understanding him, in translating him. I understood about maybe twenty-five percent of what he said after he repeated it several times.
It's my strong opinion that the gentleman is not up to the responsibility of being a juror. He does not understand the law. He does not understand what his responsibilities are. And I don't think he should continue. I don't think he's capable of being a juror. He cannot express himself. I asked him the same question three or four times and I haven't gotten a clear answer to it yet. Does anyone else have any thoughts?
MR. MEIDT: I agree, your Honor. I don't believe he's able to understand the law as it was provided by the Court, and he's not able to express himself to the other jurors. At least I was not able to understand what he was trying to express for at least seventy-five percent of what he said.
MS. LYONS: Your Honor, I disagree somewhat. It seems to me that he did understand, certainly understood the explanation given to the Court with regards to burglary and the elements.
As I recall, your Honor highlighted, one, what a burglary was, and, two, the second element of that offense was the purposeful, the unlawful taking, the intent to enter the structure to unlawfully take. And it seems to me that's where he has a problem. He said he found the first  he was guilty on the first count. Not the first count, but the first aspect of the offense. And on the second part he seemed to not be able to resolve that because of the cereal bowl which was found in the defendant's hand. And he seems to be hung on that particular aspect.
THE COURT: All right. It's my decision from all that I've heard and seen that he should be removed, and I'm going to remove him and replace him with the alternate and have the jury return tomorrow morning to begin their deliberations anew.
I need Juror Number 5. And he is the juror who was smiling at defendant, isn't he?
MS. LYONS: Yes.
(Juror No. 5 enters chambers.)
THE COURT: I'm going to replace you and let you go now. Thank you very much.
JUROR NO. 5: I don't have to come tomorrow?
THE COURT: You're done.
(Juror No. 5 is excused.)
THE COURT: I am now asking the Court Reporter, Rosemarie Levandowski, if she had difficulty in understanding the juror we just talked with in my chambers, and what she did when she had difficulty, if she did, understanding him.

*347 THE COURT REPORTER: I had much difficulty. I stopped him several times to ask him to repeat what he said, and I still asked him to repeat things over again because I understood almost nothing.
THE COURT: Thank you.
(In chambers discussion concluded.)
In 1994, our Supreme Court clarified the scope of a trial judge's discretion to remove a juror during deliberations: State v. Valenzuela, 136 N.J. 458, 467-75, 643 A.2d 582 (1994). The Court observed that R. 1:8-2(d) was intended "to strike a balance between the need for judicial economy, especially in the context of lengthy trials, and the fundamental right of defendants to a fair trial by jury." Id. at 467, 643 A.2d 582. By its terms, the rule permits discharge of a juror only for reasons that are personal to the juror and that do not relate to the juror's interaction with other jurors or with the case itself. Id. at 468, 643 A.2d 582.
The Court cautioned that the rule should be "employed sparingly" and that the "unable to continue" condition must be "strictly construed" to apply only to "compelling circumstances which are exclusively personal to the juror in question." Ibid. (quoting from State v. Trent, 157 N.J. Super. 231, 240, 384 A.2d 888 (App.Div. 1978), rev'd on other grounds, 79 N.J. 251, 398 A.2d 1271 (1979)). Thus, a trial court may not dismiss a juror merely because that juror is the lone dissenter. Valenzuela, supra, 136 N.J. at 468-69, 643 A.2d 582. Accord State v. Paige, 256 N.J. Super. 362, 380-81, 607 A.2d 164 (App.Div.), certif. denied, 130 N.J. 17, 611 A.2d 655 (1992) (holding, "a trial court cannot replace with an alternate a juror whose position is at odds with the rest of the jury").
When it appears that the jury is deadlocked because of one juror, the judge must "inquire of the jury whether further deliberation will likely result in a verdict." Valenzuela, supra, 136 N.J. at 469, 643 A.2d 582. If the answer is no, the judge should declare a mistrial. Ibid.
In deciding whether to dismiss a juror for personal "inability to continue," the judge first must create a record:

*348 If a court is uncertain whether a juror is unable to continue, the court should question the juror in sufficient detail to establish a record adequate to inform the trial court, as well as a reviewing court, whether the juror possesses the intellect and the emotional stability to discharge the duty of a juror. On that issue, a trial court should not rely on instinct.
[Id. at 472, 643 A.2d 582.]
The record should reveal whether the juror's problem stems from an inability to comprehend his or her function as a juror, or from honest indecision over an element of the State's proofs. Ibid.
Applying these standards, we think the trial judge erred in excluding Despeines. The jury cited only one problem in bringing this matter before the judge: Despeines' religious convictions which made him "unable to pronounce a guilty or not guilty verdict." Apparently the jury did not have concern over Despeines' ability to comprehend and communicate in English. During the in-chambers proceeding, Despeines clearly refuted any suggestion that his reaction was grounded in religious beliefs ("It's not because of religion."). Further, he affirmed his ability to make a decision on guilt or innocence and on right and wrong ("I can make a right judgment, what's right or what's wrong."). He also professed his ability to understand the nature of the proceedings and the jury instructions on the law.
Further, he demonstrated an understanding of the elements of burglary. Despite his imperfect English, a fair reading of the transcript shows that Despeines felt that defendant was guilty of breaking in, but that he was not guilty of intending to steal. As to what he called the "first" element, he said: "I find he's guilty because broke in the apartment to get in"; "he not like a tenant, he don't belong to the apartment, and that he broke the law to get in the apartment"; "for me it's wrong because to get to the apartment with no permission, first of all"; "But I would say, I found the first part is guilty because he get to the apartment without permission of the owner."
He then explained that ultimately he would have to vote not guilty because of the "second" element, which he apparently *349 understood to be the intent-to-steal element. Thus, he reasoned as follows:
And then second part, I say, in the pictures 
THE COURT REPORTER: Excuse me?
JUROR NO. 5: In the photograph. There the police say he find him with something in his hand, with cereal. They find him empty-handed. And if no pictures of the floor for the TV, and I didn't see the picture of the TV in the pictures on the stand because all this missing. And the picture for the room is mistaken, because you should give a full profile of the room look like.
Presumably by this testimony, Despeines was indicating dissatisfaction with the State's proofs on the issue of whether defendant intended to steal. (i.e. no pictures of the TV set on the floor and no overall photos of the apartment).
At that point the judge excused Despeines from chambers and commented: "He says guilty for the first part and not guilty for the second part. The first part is the burglary and the second part is eating cereal, which is no part of this case. He doesn't have the slightest idea, in my opinion, what is going on." Defense counsel disagreed, arguing that by the "second part" Despeines was referring to the intent-to-steal element; counsel reminded the judge that in the jury charge the judge had required two elements of proof: first, entry without permission, and second, an intent to commit a theft. The judge answered: "Oh, maybe." Nonetheless, the judge decided to dismiss Despeines.
On this record, we are not satisfied that the compelling circumstances personal to the juror in question as described in Valenzuela, supra, were established. As the record stands, it shows that Despeines understood his function and had decided on a "not guilty" verdict by rationally applying the judge's jury charge on the elements of burglary. He recognized the distinction between unlawful entry  of which he thought defendant was guilty  and entering with the intent to commit an offense  of which he thought defendant was not guilty. He also expressly affirmed his ability to decide according to the law, to reach a verdict, and to understand the trial. Thus, the premature discharge had a real *350 capacity to lead to a verdict that might not otherwise have been reached.
Together with the failure of the trial judge to instruct the jury as to the lesser included offense of trespass which was apparently the offense of which Despeines thought defendant was guilty, this error warrants reversal of defendant's conviction and remand for a new trial.
Reversed and remanded for a new trial.