731 A.2d 101

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. LANCE PHILLIPS, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued June 9, 1999—Decided June 29, 1999.

Before Judges BAIME, CONLEY and LEFELT.

*J. Michael Blake*, Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres*, Public Defender, attorney; *Mr. Blake*, of counsel and on the brief).

*Roseann A. Finn*, Assistant Camden County Prosecutor, argued the cause for respondent (*Lee A. Solomon*, Prosecutor, attorney; *Ms. Finn*, of counsel and on the brief).

The opinion of the court was delivered by

BAIME, P.J.A.D.

Defendant was convicted of purposeful or knowing murder (*N.J.S.A.* 2C:11–3a(1) and (2)), felony murder (*N.J.S.A.* 2C:11–3a(3)), two counts of attempted murder (*N.J.S.A.* 2C:5–1), aggravated assault (*N.J.S.A.* 2C:12–1b(4)), possession of a firearm for an unlawful purpose (*N.J.S.A.* 2C:39–4a), and possession of a handgun without a permit (*N.J.S.A.* 2C:39–5b). After merging several of these convictions, the trial court sentenced defendant to an aggregate term of life imprisonment plus forty years with a fifty year parole disqualifier. Although defendant advances numerous arguments on appeal, we need consider only two of his contentions. We reverse defendant's convictions because: (1) the trial court did not adequately investigate the complaint of an African-American juror that a racial comment was made during deliberations which was so unnerving as to render him incapable of serving further in the case, and (2) the trial court committed plain error in its jury instructions on accomplice liability.

## I.

We need not recount the facts at length. The charges and resulting convictions stemmed from defendant's alleged participation in a murderous plot to steal cocaine from a group of drug dealers. In the early morning hours of July 21, 1991, Johanna Rivera and Jamal Scott were seated at the dining room table of Santa Diaz's house filling vials with crack cocaine. Also present were Johanna's sister, Carmen Rivera, Santa Diaz, eleven year old Lizbeth Rivas, and her younger sister Jalika Rivas. At approxi-

mately 3:00 a.m., defendant came to visit Scott, who displayed a bag containing a large quantity of cocaine. Defendant, in turn, showed Scott his silver forty-five caliber handgun. After staying for approximately fifteen minutes, defendant left Diaz's house, only to return forty-five minutes later, but this time under less than friendly circumstances.

Carmen and Jamal were sitting on the porch when a late model, blue-green Honda appeared. Three masked men jumped out of the vehicle, one brandishing a silver forty-five caliber handgun. Carmen was able to escape unharmed by jumping over a gate and hiding in a nearby yard. Jamal ran into the house and attempted to close the door. Johanna, who had been sleeping, awoke to see a gun slip between the door and the door frame. According to Lizbeth, defendant, who had become unmasked in the struggle, pushed open the door and shot Jamal. The two other masked men then entered the house, firing their weapons at Jamal who had slumped to the floor. One of the men asked Johanna where the drugs were. She replied that Jamal had the drugs. The man shot and wounded Johanna, who avoided further injury by "playing dead." Lizbeth was also shot and wounded. The assailants then made their escape with the drugs.

The police arrived at 5:00 a.m. and found Jamal fatally wounded, lying adjacent to the front door. A subsequent autopsy revealed that he died from nine gunshot wounds to his head, trunk and arm. All of the bullets recovered from the body were forty-five caliber. However, the police also discovered seven nine-millimeter shells at the murder scene.

Lizbeth was admitted to a nearby hospital, suffering from a gunshot wound to her chest. Although medicated, Lizbeth appeared coherent and was able to identify a photograph of defendant. Johanna's injury was less serious. She was treated in the emergency room for a gunshot wound to her forearm, and was released the same day. Carmen, who as we noted previously, emerged from the incident unscathed, told the police that defendant fit the description of the man who had shot at her.

Defendant was immediately apprehended. Initially, defendant denied any involvement in the shootings and claimed that he "ha[d] an alibi." However, he later admitted that he conceived the plot to steal Scott's drugs shortly after visiting him at the Diaz house. In his statement, defendant conceded that he, Morris Allen Jackmon,[1] and Leonard Paulk donned black clothing and drove to Diaz's residence with the intent to steal the cocaine. Defendant claimed that he was unarmed and he was unaware that his confederates possessed handguns. According to defendant's statement, he was the last to emerge from the blue-green Honda. He claimed that he "pushed" Carmen from the path of gunfire and then entered the house, where he saw Scott on the floor and Johanna attempting to crawl away. Defendant asserted that he pulled off his mask because the house was full of smoke. He admitted that he left with Jackmon and Paulk and that the three men divided the ten ounces of cocaine they had taken from the house.

At trial, defendant disavowed his prior statement and presented an alibi defense. We need not describe defendant's testimony or that provided by his alibi witnesses. It is fair to characterize defendant's case as weak, and in any event, this evidence was given no credence by the jury.

## II.

We begin by describing the circumstances surrounding defendant's claim of juror misconduct. After jury deliberations had commenced, Connie Jones, a deliberating juror, complained to the trial court that another juror had made a racist remark. Jones related that while the jury was discussing the use of a forty-five caliber handgun an unidentified juror turned to him and asked

---

[1] In *State v. Jackmon*, 305 *N.J.Super.* 274, 702 A.2d 489 (App.Div.1997), we reversed Jackmon's conviction for purposeful or knowing murder, first degree attempted murder, second and third degree aggravated assault and affirmed his conviction for felony-murder, first degree armed robbery and weapons possession. The dispositive issue before the court was erroneous jury instructions.

whether Jones knew "what a [forty-five] was made for." According to Jones, the juror then said that "[i]t was made for African tribes called the Fuzzy–Wuzzies." Jones told the judge that he "felt very insulted" and that he had "never heard of such a tribe." The judge responded that "[t]here . . . was a group of people . . . known as the Fuzzy–Wuzzies" and that in the prior century a British general had been sent to North Africa and had been defeated in battle by that tribe. Jones was not mollified, however, and repeated that as an African American he had "never heard of that phrase." Although Jones either declined or was unable to identify the juror who made the allegedly racist remark, he was able to describe in general terms where the juror had been seated during the trial. Obviously, upset, Jones noted that he felt "uncomfortable" sitting as a juror, even after hearing the judge's explanation. Jones repeated that he did not "want to go into the [jury] room," and that he would do so only if "ordered" by the judge, but he could not "come to a clear verdict" because he was "mad and angry." At that point, the judge excused Jones from further service and replaced him with an alternate. We note that defendant's trial counsel did not interpose an objection to the dismissal of Jones, although earlier he had asked that Jones remain on the jury. After instructing the reconstituted jury to begin its deliberations anew, the judge asked the jurors whether Jones had spoken to them about his inability to continue serving in the case. The judge also asked whether any of the jurors had said anything "offensive" during the earlier deliberations. This was in accord with defense counsel's request. No juror responded affirmatively.

Our recitation of the facts would not be complete without a brief description of the battle between British General Charles "Chinese" Gordon and the Mahdist forces in the Sudan. The battle and its aftermath are recounted in detail in several biographies and historical accounts, *see* Brian Farwell, *Prisoners of the Mahdi* (1967); Roy MacGregor–Hastie, *Never to be Taken Alive: A Biography of General Gordon* (1985), but we describe only the features salient to the issue presented. In the 1820's, Egypt, then

a puppet state controlled by Great Britain, invaded and unified the Sudan. The slave trade was booming in the Sudan, which apparently offended the sensibilities of several European countries. Gordon first came to the Sudan as governor of one of its principal provinces. One of his primary goals was to stamp out the slave trade. In 1881, Mohammed Ahmed proclaimed himself the Mahdi, the messiah of the Muslim tradition, and led a jihad against the foreign occupiers of the Sudan. The British referred to the Mahdist army as "Fuzzy–Wuzzies." The Mahdist forces ultimately encircled Khartoum. After a long siege, the Mahdist army poured into the city and killed Gordon and his troops.

It is against this factual backdrop that we consider defendant's arguments. Defendant, an African–American, contends that the trial judge erred by excusing Jones from further service in the case and by failing to conduct a full inquiry concerning the unidentified juror's reference to the Fuzzy–Wuzzies. We first examine defendant's claim that the trial judge mistakenly exercised his discretion under *R.* 1:8–2(d), which permits replacement of a sitting juror because of death, illness "or other inability to continue."

▮ The *Rule* is intended to alleviate the tension between competing values—the need for judicial economy and the fundamental right to a fair trial by jury. *See State v. Trent,* 157 *N.J.Super.* 231; 238–39, 384 *A.2d* 888 (App.Div.1978), *rev'd on other grounds,* 79 *N.J.* 251, 398 *A.2d* 1271 (1979). Prior to adoption of the *Rule,* the prevailing practice was to dismiss alternate jurors once the case was submitted to the jury. *See Report of Supreme Court Committee on Criminal Procedure,* 95 *N.J.L.J.* 341, 356 (Apr. 13, 1972). A mistrial was thus necessary whenever a deliberating juror became ill or otherwise unable to proceed. *Ibid.* The Rule was thus intended to permit substitution of a deliberating juror who, for personal reasons unrelated to his interaction with other jurors, could not continue to serve. Balanced against the interest of conserving judicial resources is the constitutional right of trial by a fair and impartial jury. *U.S.*

*Const.*, amend. VI, *N.J. Const.* art. I, ¶ 9. In a variety of settings, our Supreme Court has said that this fundamental right must be "scrupulously protected from encroachment or impairment." *State v. Simon,* 79 *N.J.* 191, 199, 398 *A.*2d 861 (1979); *see also State v. Ingenito,* 87 *N.J.* 204, 210–12, 432 *A.*2d 912 (1981).

In adopting the *Rule,* our Supreme Court sought to accommodate these competing interests by assuring that the criteria for substitution of a sitting juror by an alternate relate exclusively to the personal situation of the juror himself and not to his interaction with the other jurors or with the case itself. In its most recent treatment of the subject, *State v. Hightower,* 146 *N.J.* 239, 680 *A.*2d 649 (1996), the Court emphasized that the inability to continue standard "may not be invoked to remove a deliberating juror when the record merely reveals that the juror has a position that is different from that of other jurors," or "to remove a deliberating juror where the record reveals that the juror's problems are related to both personal circumstances and factors arising from the juror's interactions with other jurors." *Id.* at 255, 680 *A.*2d 649 (citing *State v. Valenzuela,* 136 *N.J.* 458, 468–69, 473, 643 *A.*2d 582 (1994)).

The rule has been applied accordingly. In *Hightower,* for example, one of the jurors stated in the course of heated deliberations that the victim of the crime had three children, a fact not elicited during the trial. The trial judge ordered that the juror be replaced with an alternate and instructed the reconstituted jury to disregard the outside information and began its deliberations anew. The Supreme Court reversed, holding that the "unable to continue" standard was not satisfied because the juror's misconduct "was related to the case and to his interaction with the other jurors." *Id.* at 255, 680 *A.*2d 649. While noting that it was conceivable "that there might be some circumstances in which juror misconduct during jury deliberations might permit substitution of the offending juror," *ibid.,* the Court concluded that the "only option available" under the facts presented was the "[d]ecla-

ration of a mistrial." *Id.* at 255–56, 680 A.2d 649 (quoting *State v. Trent,* 157 *N.J.Super.* at 239, 384 A.2d 888).

The Court reached a similar result in *State v. Valenzuela,* 136 *N.J.* 458, 643 A.2d 582. During deliberations, the foreperson of the jury complained to the trial judge that one of the sitting jurors did "not understand the process" and repeatedly changed her position. *Id.* at 464–65, 643 A.2d 582. The juror was questioned intensively by the trial judge and equivocated in her responses. *Id.* at 465, 643 A.2d 582. The judge found that she was unable to function as a juror and thus replaced her with an alternate. *Id.* at 466, 643 A.2d 582. We reversed defendant's convictions. 262 *N.J.Super.* 392, 621 A.2d 63 (1993). The Supreme Court granted certification and agreed with our conclusion that the trial judge had misapplied *R.* 1:8–2(d). 136 *N.J.* at 471–72, 643 A.2d 582. In reaching this conclusion, the Court found evidence in the record that "the circumstances leading to the jury's and the juror's desire for discharge may have stemmed from interactions in the jury room." *Ibid.* Specifically, the Court held that "a juror cannot be discharged as 'unable to continue' unless the record adequately establishes that the juror suffers from an inability to function that is personal and unrelated to the juror's interaction with the other jury members." *Id.* at 472–73, 643 A.2d 582. The Court said that "[t]he record on which a [judge] may excuse a deliberating juror must reveal with greater clarity that a juror cannot proceed with deliberations and fulfill the functions of a juror, particularly when the record contains any suggestion that the problems regarding the juror stem from interactions with the other jurors and not from circumstances 'exclusively personal to the juror in question' ". *Id.* at 472, 643 A.2d 582 (quoting *State v. Trent,* 157 *N.J.Super.* at 240, 384 A.2d 888).

We have applied *R.* 1:8–2(d) sparingly. In *State v. Harvey,* 318 *N.J.Super.* 167, 723 A.2d 107 (App.Div.1999), a juror made "facial gestures" during the presentation of evidence indicating that he disbelieved the State's witnesses. During deliberations, the prosecutor learned that the juror had deliberately falsified his respons-

es to the court's voir dire and that he had been convicted of an offense as a juvenile. On motion of the prosecutor, the deliberating juror was replaced by an alternate. We reversed the defendant's conviction, finding that the juror's "inability to continue" did not relate to circumstances " 'exclusively personal to the juror in question.' " *Id.* at 174, 723 *A.*2d 107 (quoting *State v. Valenzuela,* 136 *N.J.* at 472, 643 *A.*2d 582).

In *State v. Singleton,* 290 *N.J.Super.* 336, 675 *A.*2d 1143 (App. Div.1996), the jury in the course of its deliberations sent a note to the trial judge indicating a juror could not reach a decision because he could not "condemn anyone" for "profoundly religious" reasons. *Id.* at 343, 675 *A.*2d 1143. After questioning the juror in detail, the judge found that the juror was unable to "understand the law," and thus replaced him with an alternate. *Id.* at 346, 675 *A.*2d 1143. We reversed the defendant's conviction on the ground that "we [were] not satisfied that ... compelling circumstances personal to the juror, as described in *Valenzuela,* were established." *Id.* at 349, 675 *A.*2d 1143.

We most recently considered the question in *State v. Adams,* 320 *N.J.Super.* 360, 727 *A.*2d 468 (App.Div.1999). There, the defendant confessed to killing the victim. At trial, he claimed the police had beaten him in order to obtain the incriminatory statement. During deliberations, the jury sent a note to the trial judge, complaining that one of the jurors had said he was told by a relative that "the police often beat accused criminals." *Id.* at 365, 727 *A.*2d 468. When questioned by the judge, the juror responded that his statement flowed from his life experiences as well as from conversations with others. *Ibid.* The judge replaced the juror with an alternate, finding that he was unable to limit his consideration of the issues to the evidence presented. *Ibid.* We reversed on the ground that "[o]nce the case ha[d] been given to the jury, ... discharge and substitution [were] no longer appropriate" because the juror's bias arose "in the interaction between jurors." *Id.* at 367, 727 *A.*2d 468. We said that "[i]n such instances, once

the court determines that a taint exists, it must discharge the entire jury, *i.e.*, declare a mistrial." *Ibid.*

The case before us is similar to, but not factually congruent with, the decisions we have described. It is literally true that Jones' inability to continue serving as a juror emanated from his interaction with another juror during the course of deliberations. Defendant thus argues that *Hightower* and *Valenzuela* are clearly applicable, and that the trial judge was obliged to declare a mistrial. The State contends that Jones' interaction with the other juror is irrelevant to the issue presented because his reaction to the juror's comment was intensely personal and thus did not relate to the deliberation process. The State asserts that replacement of a deliberating juror should be allowed when the juror's inability to continue stems from his interaction with other jurors but is a "unique reaction" wholly unrelated to the issue of the defendant's guilt or innocence. Although perhaps the State's position has much to commend it, the language employed by the Supreme Court in describing the metes and bounds of a trial judge's authority to replace a deliberating juror is not so limited. Nor can we say, as the State urges, that Jones' reaction to the unidentified juror's Fuzzy–Wuzzies reference was exclusively personal once the trial judge explained the historical roots of the juror's comment. The juror's comment was perhaps innocuous. However, even in the context of its historical roots, the remark can reasonably be interpreted as having sinister implications, *i.e.*, referring to the White Man's Burden to civilize primitive indigenous populations. In any event, the Fuzzy–Wuzzies was a name given to the Mahdist forces by the British at the height of England's imperial power. We cannot fairly say that a substantial segment of the African–American population, or indeed, a cross-section of the general population, would not find the reference insulting or pejorative.

■ We need not dwell on the subject for it leads us to our principal reason for reversing defendant's convictions. We understand the unenviable dilemma in which the trial judge was placed.

A complete inquiry into the context in which the juror's remark was made and its impact on the jury's deliberation process could possibly have injected prejudice into the case where it otherwise did not exist. We are nevertheless convinced that the trial judge's perfunctory questioning of the reconstituted jury concerning Jones' dismissal was inadequate to protect the integrity of the proceedings. As we have pointed out, the juror's Fuzzy–Wuzzies reference might have been innocuous, but it was also subject to a less benign interpretation. We are satisfied from our reading of the record that the identity of the juror could have been found with relative ease. At the very least, the juror should have been questioned out of the presence of the other jurors. We also think that the remaining jurors should have been questioned singly by the judge to determine the impact, if any, of the juror's Fuzzy–Wuzzies reference. A person's manner may negate a barb his oral utterances seem to hold, just as it may supply a sting that might otherwise not be apparent. While a judge cannot make inquiry into the deliberative process, *State v. La Fera,* 42 *N.J.* 97, 106, 199 *A.*2d 630 (1964); *State v. Kociolek,* 20 *N.J.* 92, 100, 118 *A.*2d 812 (1955), careful questioning of the jurors could have shed light on the incident and could have provided a more meaningful record for appellate review. *State v. Bey,* 112 *N.J.* 45, 74–92, 548 *A.*2d 846 (1988) (refusal to question jurors concerning newspaper articles constituted reversible error); *State v. Wormley,* 305 *N.J.Super.* 57, 68–70, 701 *A.*2d 944 (App.Div.1997) (failure to question jurors concerning their outside knowledge of State's primary witness was reversible error), *certif. denied,* 154 *N.J.* 607, 713 *A.*2d 498 (1998); *State v. Scherzer,* 301 *N.J.Super.* 363, 487–88, 694 *A.*2d 196 (App.Div.) (trial judge must question jurors concerning allegations of misconduct), *certif. denied,* 151 *N.J.* 466, 700 *A.*2d 878 (1997); *State v. Vergilio,* 261 *N.J.Super.* 648, 654–56, 619 *A.*2d 671 (App. Div.) (failure to question distraught juror was reversible error), *certif. denied,* 133 *N.J.* 443, 627 *A.*2d 1147 (1993).

■ We recognize that the trial judge's actions were intended to avoid a deplorable waste of resources. We also acknowledge that

the record contains substantial evidence of the defendant's guilt. We emphasize, however, that an allegation that a juror is racially biased strikes at the very heart of the defendant's right to a trial by an impartial jury. We add that public confidence in the fair administration of justice is undermined if such allegations are not thoroughly investigated. A trial court must be especially vigilant in investigating the specter of racial prejudice in the judicial process. The overarching principle in defining the scope of the inquiry is that the breadth of the questioning should be sufficient to permit the entire picture to be explored. If that cannot be done without impairing the jury's ability to proceed, then the only option available to the trial judge is to abort the proceedings by declaring a mistrial. The judge in this case conscientiously attempted to fulfill his duty. But we conclude that his actions did not meet the demanding standards that should be imposed when dismissing a juror pursuant to *R.* 1:8–2(d), particularly where allegations of racial bias are made.

■ We have considered the option of remanding this case to the Law Division for a hearing to determine whether the jury was tainted. *See State v. Bisaccia,* 319 *N.J.Super.* 1, 16–19, 724 *A.*2d 836 (App.Div.1999). We do not deem such a course practical under the circumstances. The judge who presided over the trial has retired. Although he can be recalled for the purpose of conducting a hearing as to taint, memories have undoubtedly faded and, significantly, neither the State nor the defendant has urged us to adopt this approach. Our Supreme Court has recently reminded us that "we ought not reconvene the jury that [has] convicted ... [a] defendant." *State v. Harris,* 156 *N.J.* 122, 154, 716 *A.*2d 458 (1998). We are thus obliged to reverse.

### III.

■ We also conclude that the trial judge committed plain error in his instructions on accomplice liability. Specifically, the judge did not tell the jury that defendant could be found guilty as an accomplice of a lesser-included offense, even though the principal

is found guilty of a more serious crime. The jury was not told that parties who participate in a criminal act may be guilty of different degrees or different offenses, depending on their own actions and state of mind. These are the same deficiencies we identified in *State v. Bielkiewicz*, 267 *N.J.Super.* 520, 632 *A.*2d 277 (App.Div.1993).

■ We have said that "[t]hese principles are particularly important where multiple participants engage in a violent attack with the potential for differing states of mind." *State v. Cook*, 300 *N.J.Super.* 476, 486, 693 *A.*2d 483 (App.Div.1996). The State contends that the error was harmless, however, because of defendant's "all-or-nothing" defense, *i.e.*, his claim of alibi and his denial of participation in the crimes charged. The State's position overlooks defendant's statement to the police that he concocted the plot to steal drugs from the victims and engaged in the robbery, although unaware of his confederates' possession of weapons. We recognize that defendant disavowed his statement at trial. The fact remains, however, that the jury was not bound to believe his disavowal. We are satisfied that with appropriate instructions, the jury could reasonably have found that defendant did not commit the homicidal act and did not concur in his confederates' plan to arm themselves and shoot the victims, and thus his state of mind and level of participation warranted convictions of lesser crimes than those committed by one or more of his compatriots. Distinguishable on this basis are *State v. Eure*, 304 *N.J.Super.* 469, 472–73, 701 *A.*2d 464 (App.Div.), *certif. denied*, 152 *N.J.* 193, 704 *A.*2d 23 (1997); *State v. Scherzer*, 301 *N.J.Super.* 363, 472–75, 694 *A.*2d 196 (App.Div.), *certif. denied*, 151 *N.J.* 466, 700 *A.*2d 878 (1997); *State v. Williams*, 298 *N.J.Super.* 430, 440–42, 689 *A.*2d 821 (App.Div.) *certif. denied*, 150 *N.J.* 27, 695 *A.*2d 669 (1997); *State v. Rue*, 296 *N.J.Super.* 108, 114–16, 686 *A.*2d 348 (App.Div.1996), *certif. denied*, 148 *N.J.* 463, 690 *A.*2d 611 (1997); *cf. State v. Norman*, 151 *N.J.* 5, 39, 697 *A.*2d 511 (1997) ("it [was], at best, a remote possibility that the [jury was] distracted from [its] task by a conclusion that the principal had possessed a more

culpable intent than the accomplice" where the defendant was tried alone). We note that we reversed codefendant Jackmon's convictions for purposeful or knowing murder, attempted murder and aggravated assault for essentially the same reason. *State v. Jackmon,* 305 *N.J.Super.* at 300, 702 *A.*2d 489; *see also State v. Harrington,* 310 *N.J.Super.* 272, 277, 708 *A.*2d 731 (App.Div.), *certif. denied,* 156 *N.J.* 387, 718 *A.*2d 1216 (1998).

We stress that the prosecutor requested the charge on accomplice liability and advanced that theory, as an alternative basis for criminal liability, in his summation. At oral argument, we were advised by the prosecutor that the State's claim of accomplice liability was intended to apply only to the shooting of Johanna. We assume, therefore, that this issue will not reappear at the new trial.

The judgment of convictions is reversed, and the matter is remanded to the Law Division for a new trial.